**STATE of Tennessee, Appellee,**

v.

**Monica Denise BOYD, Appellant.**

Court of Criminal Appeals of Tennessee, at Jackson.

June 28, 1995.

Thomas M. Minor, Somerville, for Appellant.

Charles W. Burson, Attorney General & Reporter, Rebecca L. Gundt, Assistant Attorney General, Criminal Justice Division, Nashville, Elizabeth T. Rice, District Attorney General, Somerville, for Appellee.

## OPINION

SUMMERS, Judge.

The appellant, Monica Denise Boyd, was convicted by a Fayette County jury of the attempted first degree murder of Dwight Coleman. She has appealed to this Court alleging insufficiency of evidence. After a careful review of the facts and the guidance of our Supreme Court, we conclude that the evidence introduced at trial is not sufficient to support a conviction of attempted first degree murder. We hold that the appellant's conviction must be reduced to attempted second degree murder.

## FACTS

On May 26, 1993, Boyd arrived at her home at 7540 Grimes Road after working all day as a beautician in downtown Memphis. Boyd, single and the mother of two minor children, had resided for nearly five years at the home of her grandmother and step-grandfather, Fred Moore. Moore's residence was the place where several neighborhood men would gather and sit under a tree. They would talk, play games, and often drink alcohol. One of the men who regularly attended these gatherings was Dwight Coleman. Coleman had known Boyd all of her life. For at least two years Coleman had spoken to Boyd in indecorous language suggesting that she ought to have sexual relations with him. On several occasions in front of the other men, Coleman's sexual suggestions were explicit, crude, and vulgar. Boyd would not respond to these comments except to pronounce that she rejected and resented them. As recently as the Sunday prior to May 26th, Coleman had made crude remarks to her in the presence of other men gathered in the yard while she was being visited by her boyfriend. Although her boyfriend did not hear these remarks, Boyd was incensed. As a result of this incident, Boyd informed Coleman's wife that he had been making these sexual remarks to her and asked Coleman's wife to speak to him about it. This apparently was the second time that Boyd had told Coleman's wife about her husband's insults.

Around 7:30 to 8:00 p.m. on May 26th, when Boyd was walking up to the home, Coleman again made these sexually explicit remarks. He asked Boyd for "some trim," a remark in the vernacular which refers to sexual intercourse. Obviously, Boyd knew what he meant. She went back to her car; and, after retrieving a .22 caliber revolver, returned. Informing Coleman that she once again did not appreciate these remarks, she shot him in the abdomen and lower chest area and then entered her home. This shooting was witnessed by Fred Moore and several of his regular gatherers in the yard. Coleman was hospitalized for several weeks from his wounds.

Dwight Coleman testified at the trial. Coleman stated that he went over to Fred Moore's house every day. He said that the men would "... hang out and just sit around, talk, stuff like that." He said that he saw Boyd "every day." He admitted making sexual remarks to her and that he had been doing this for several years. He indicated that it took her five to ten minutes to retrieve the gun; and if he had known that she was going to get a gun, he would have fled. He acknowledged that he knew that Boyd had told his wife about the sexual remarks. Since his wife apparently did not do anything about his comments after the first time Boyd told her, he was not worried about his wife's reactions thereafter.

Coleman's testimony regarding the length of time for Boyd to retrieve the gun and return to shoot him was introduced to prove premeditation and deliberation. On cross-examination when asked about the time frame, Coleman was elusive. He finally admitted that he was under the influence of alcohol and had poor recall:

Man, I was drinking. I can't remember what—what she did or what I did...."

Coleman admitted to counsel that he had been drinking beer and wine. He also said that he remembered Boyd's running back into the house. He did not know he was hit by the bullet until after she had left.

Bob Tisdale of the Fayette County Sheriff's Department arrested Boyd after the shooting. She gave him no trouble and showed him in Fred Moore's house the .22 revolver and five live rounds all of which were on a shelf. She made a voluntary statement admitting that she had the gun in the glove compartment. She admitted shooting Coleman.

Jim Moore testified that as he was "going to the bathroom," he heard Dwight Coleman ask Monica Boyd "for some trim." He heard Boyd tell him to leave her alone and that she was "tired of it."

Two other witnesses testified that they had heard Coleman ask Boyd for sex on several occasions. They acknowledged that Monica Boyd did not appreciate these remarks.

Monica Boyd testified in her defense. A high school graduate, she had been working at a beauty shop in Memphis for almost two years. She had previously attended cosmetology school. She was paid by the job and sometimes worked very long hours. Because the beauty shop was in a high crime area of Memphis, she felt like she needed a weapon to protect herself. She said that beauty shops in her area had been robbed. She also stated that on the previous Thanksgiving a customer of her beauty shop got raped close by the building where she worked.

Boyd acknowledged that Dwight Coleman had been talking dirty to her for two or three years. Almost every time she went to her home and the men were gathered, which was often, Coleman would confront her. For example, she related as follows:

And once before he told me, "I bet you got some good p—between your legs. When you [sic] going to give me some of that p—? You giving other folks some of your p—. Why you don't [sic] give me none of your p—?" I said, "I don't give my body out to people like that."

This is a sample of the type of language that Coleman regularly used in addressing Boyd. It belabors the obvious to say that his comments were of no redeeming social value.

Boyd said that she told Coleman's wife two times about his conduct. The last time was on the Sunday before the shooting, although Coleman actually did not know she had made the last complaint until after he was shot and in the hospital. Coleman regularly made

these comments in front of a lot of men. Boyd was constantly humiliated. The last time for her to be totally humiliated before the shooting was when her boyfriend was visiting her.

Boyd testified that it did not take her five to ten minutes to retrieve the gun. She said she had the gun in her glove compartment and that is where she got it. She said that when Coleman made these comments to her, she got mad and basically could not control herself:

> It just seemed like I got real warm on the inside and then he had this cold look in his face when he had told me that—real cold look. And I just got real hot, just sort of like I had a head rush. And I was real upset.

After Coleman was shot and was waiting on the ambulance, he told Boyd's grandmother that he was sorry. When questioned about his newly found contrition, Boyd said that he should have been thinking about that on the many times that he was saying those vulgar things.

Coleman admitted during his testimony that he had been making sexual remarks of this nature to Boyd for seven or eight years. He said that each one of them played around with these sexual remarks, and he was surprised at Boyd's being offended on the day of the shooting. Boyd denied that she ever took these comments in stride. Rather, her position was that she had no choice but to put up with them.

## ANALYSIS

■ Boyd contends that the evidence is insufficient to sustain the conviction of attempted first degree murder. When this Court considers the sufficiency of evidence, we are governed by the rule that all conflicts in testimony, upon a conviction in the trial court, are resolved in favor of the state. Upon appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978). However, the record on appeal must demonstrate that the prosecution carried its burden at trial of establishing that the attempted homicide in

question was, indeed, first degree murder. Despite a vigorous prosecution, we conclude that the prosecution did not carry its burden in proving all of the necessary elements of the highest crime charged.

■ Once a homicide, or in this case an attempted homicide, is established, it is presumed to be murder in the second degree. *Witt v. State,* 46 Tenn. (6 Cold.) 5, 8 (1868). To elevate the offense to first degree murder the state must prove the elements of premeditation and deliberation. *Bailey v. State,* 479 S.W.2d 829, 833 (Tenn.Crim.App.1972).

T.C.A. § 39–13–202(a)(1) (1992) defines first degree murder as "an intentional, premeditated and deliberate killing of another...." The elements of deliberation and premeditation are defined as follows:

(1) "Deliberate act" means one performed with a cool purpose; and

(2) "Premeditated act" means one done after the exercise of reflection and judgment.

T.C.A. § 39–13–201(b)(1), (2) (1992).

In 1992, our Tennessee Supreme Court delineated ground rules on the subject of premeditation and deliberation in *State v. Brown,* 836 S.W.2d 530 (Tenn.1992). In *Brown,* the Court distinguished between these two elements:

> Hence, perhaps the two most oft-repeated propositions with regard to the law of first-degree murder, that the essential ingredient of first-degree murder is premeditation and that premeditation may be formed in an instant, are only partially accurate, because they are rarely quoted in context. In order to establish first-degree murder, the premeditated killing must also have been done deliberately, that is, with coolness and reflection. (Citations omitted)
>
> \* \* \* \* \* \*
>
> The obvious point to be drawn from this discussion is that even if intent (or "purpose to kill") and premeditation ("design") may be formed in an instant, deliberation requires some period of reflection, during which the mind is "free from the influence of excitement, or passion." *Clarke v.*

*State*, 218 Tenn. 259, 402 S.W.2d 863, 868 (1966).

\* \* \* \* \* \*

It is consistent with the murder statute and with case law in Tennessee ... that no specific period of time need elapse between the defendant's formulation of the design to kill and the execution of that plan.... If it was not clear from the opinions emanating from this Court within the last half-century, it is now abundantly clear that the deliberation necessary to establish first-degree murder *cannot* be formed in an instant. It requires proof ... that the homicide was "committed with 'a cool purpose' and without passion or provocation," which would reduce the offense to either to second-degree murder or to manslaughter, respectively.

*State v. Brown*, 836 S.W.2d at 539, 540, 543.

Five months after the *Brown* case was filed by our Supreme Court, the Court rendered the case of *State v. West*, 844 S.W.2d 144 (Tenn.1992), which clearly followed *Brown*. In *West*, the Court emphasized that premeditation requires a previously formed design or intent to kill. Deliberation requires more than that the killing be done with a cool purpose. In other words, the killer, or in this case the attempted killer, must be free from passion of the moment.

In *West*, the proof showed that the defendant was assaulted by the victim while both of them were mowing weeds on tractors along the roadside. West, the defendant, went home and returned briefly. Thereupon the victim allegedly attacked him with an iron bar which prompted West to get off of his tractor and shoot the victim in self-defense. Several passers-by recalled seeing no weapon in the victim's hand. One of the state's witnesses testified about the neighborliness of the victim.

The evidence showed that after the shooting West waited an hour and a half before calling the police. Before the police arrived, he put his tractor and his trailer away, went to the grocery store, and visited a friend, all without saying anything about the incident. When the police arrived, he eventually led them to the place where he had hidden the gun in some weeds.

Although West claimed that the victim had hit him with an iron bar causing a cut on his arm, a serologist found no blood on the bar. A medical examiner testified that the wound to the victim was a "distant gunshot wound." West was convicted of first degree murder. The Supreme Court reduced the conviction to second degree murder.

In *West*, the Supreme Court reemphasized the analysis of *State v. Brown* and the presumption of second degree murder. The Court held that although there was ample evidence to believe that West maliciously killed his victim, the prosecution produced no evidence that the intent to kill was premeditated and deliberate:

The element of premeditation requires a previously formed design or intent to kill. *McGill v. State*, 4 Tenn.Crim.App. 710, 720, 475 S.W.2d 223, 227 (1971); *Swan v. State*, 23 Tenn. (4 Hum.) 136, 139 (1843). Deliberation, on the other hand, requires that the killing be done with a cool purpose—in other words that the killer be free from the passions of the moment. Moreover, as indicated in our recent opinion in *State v. Brown*, the fact that "premeditation can be formed in an instant" must be viewed in contrast to the element of deliberation, which obviously cannot be formed instantaneously." While it remains true that no specific length of time is required for the formation of a cool, dispassionate intent to kill, *Brown* requires more than a "split-second" of reflection in order to satisfy the elements of premeditation and deliberation. *Brown*, 836 S.W.2d at 543. Without evidence that the killing was willful, malicious, premeditated, and deliberate, this Court cannot uphold a conviction for first-degree murder. *Everett v. State*, 528 S.W.2d 25, 26 (Tenn.1975); *Bass v. State*, 191 Tenn. 259, 269, 231 S.W.2d 707, 711 (1950).

844 S.W.2d at 147, 148.

■ In the present case, Coleman had been making crude remarks to Boyd for years. Boyd had no choice but to put up with him inasmuch as Coleman made these remarks in the yard of her home. Her rela-

tives allowed the conduct to persist. Twice she had told Coleman's wife about the remarks, to no avail. On the Sunday preceding the shooting, Coleman embarrassed her again in front of several men in the yard while she was being visited by her boyfriend. She again told Coleman's wife. When Coleman made sexual references to her on the day of the shooting, this simply got the best of her. In a fit of passion and with a hot temper, she retrieved her gun from her car, returned, and shot Coleman one time. Instead of shooting him repeatedly, she stopped after one shot and ran into the house. She simply had reached her boiling point. Thereafter, she cooperated with the police and gave them no trouble.

The state offered no other evidence of Boyd's attempted commission of a deliberate and premeditated murder. On these facts, we cannot uphold a conviction for attempted first degree murder. In the absence of proof of deliberation and premeditation, an attempted unlawful killing is presumed to be attempted second degree murder. *See State v. Brown,* 836 S.W.2d at 543, *State v. Bullington,* 532 S.W.2d 556, 560 (Tenn.1976). We modify the judgment to attempted second degree murder.

Accordingly, we reverse the judgment of attempted first degree murder and modify it to attempted second degree murder. The case is remanded to the trial court for Boyd's new sentencing as to attempted second degree murder.

**REVERSED, MODIFIED, AND REMANDED FOR NEW SENTENCING.**

PEAY, J., concurs.

HAYES, J., concurs in part and dissents in part with attached opinion.

HAYES, Judge, concurring in part and dissenting in part.

I concur with my colleagues' conclusion that the evidence was insufficient to establish the elements of attempted first-degree murder. However, under the facts presented at trial and found by the majority, I would conclude that the appellant is guilty of attempted voluntary manslaughter rather than attempted second-degree murder.

The distinction between voluntary manslaughter and second-degree murder is that voluntary manslaughter requires that the killing resulted from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner. *See* Tenn.Code Ann. § 39–13–210, 211(a) (1991). The majority explicitly concludes that the appellant committed the offense "in a fit of passion and with a hot temper." I agree with this conclusion and would furthermore conclude that the appellant's state of passion was produced by adequate provocation, which would lead a reasonable person to act in an irrational manner. I would find that the appellant's reason was obscured and that her act was the result of impulse, based upon the demeaning and taunting nature of the conduct involved, coupled with its longstanding duration. I therefore conclude that the appellant is guilty of criminal attempt to commit voluntary manslaughter, not the offense of criminal attempt to commit second-degree murder.