# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs March 4, 2003

## STATE OF TENNESSEE v. DEMOND GARDNER

### Appeal from the Criminal Court for Shelby County
### No. 01-00788     J.C. McLin, Judge

---

### No. W2002-00607-CCA-R3-CD  - Filed June 26, 2003

---

The defendant, Demond Gardner, appeals as of right from his conviction by a jury in the Shelby County Criminal Court of first degree, premeditated murder.  He received a sentence of life imprisonment with the possibility of parole.  He contends that (1) the evidence is insufficient to support his conviction, (2) the trial court erroneously ruled that the state could question him about the significance of his tattoo, (3) the trial court erred in admitting inflammatory and prejudicial photographs of the victim, and (4) the trial court erred in allowing improper and prejudicial argument by the prosecutor.  We affirm the trial court≤s judgment of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

Glenn I. Wright, Memphis, Tennessee, for the appellant, Demond Gardner.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Jennifer Smith Nichols and David Norfleet Pritchard, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case stems from the October 27, 2000 shooting death of eighteen-year-old Michael Martin. Zain Holst testified that he and the victim were friends and had both graduated from South Side High School in 2000.  On the morning of his death, the victim attended a Homecoming pep rally, then met Mr. Holst outside South Side High School.  After the pep rally, a fight broke out.  Mr. Holst and the victim were not involved in the fight but stood on the opposite corner down the street from where the fight occurred.  After the fight was over, they walked toward the scene of the fight to see a damaged car, then walked down Lucille Avenue in the direction of Longview Middle School.  As they walked on the sidewalk with the victim walking closer to the street, they approached a friend≤s car in order to get a ride.  Mr. Holst said a white car approached them from the

opposite direction, pulled over to the wrong side of the road, and stopped a couple of feet from them. He said no other car was in front of the white car. He said the defendant popped up from the backseat and pointed a long gun at them through the window. They did not exchange words or gestures with the defendant. Mr. Holst and the victim ducked and began to run toward their friend's car, and the defendant fired a shot. Mr. Holst turned around before reaching the car because he realized the victim had been shot in the face. The white car then drove off. Mr. Holst also said that neither he nor the victim were members of a gang.

Eighteen-year-old Rafielle McGhee testified that she had been a friend of the victim for a number of years and at the time of the shooting was a student at South Side High School. Ms. McGhee said that on the morning of October 27, 2000, the defendant jumped in front of a car and made a gang sign at the boys in the car, who were from another high school. The defendant and the boys in the car began to argue and then throw punches. The defendant did not have a gun during this fight. She said that three or four people were fighting against the defendant and one other person. The victim was not involved in the fight. After the fight was over, the boys in the other car left. The defendant left with Chevis Maxwell in a car driven by Anika Glover. Ms. McGhee eventually left with her aunt. After driving around the block, she spotted the victim and Zain Holst walking down the sidewalk of Lucille Avenue. Neither were armed, and the victim was walking closer to the street. Ms. McGhee saw a white car containing Ms. Maxwell, Ms. Glover, and the defendant slow down as it approached the victim. The defendant, who was sitting in the backseat on the driver's side, pointed a gun out of the window and shot the victim. Before the shooting, the defendant did not exchange words or gang signs with the unarmed victim or Mr. Holst.

John Holmes, a project facilitator with the Memphis City Schools, testified that he was at South Side High School on the day of the shooting to attend an 11:30 a.m. meeting with the principal. The fight started about the time he entered the school. He said he saw three or four teenagers jumping on another teenager. He informed security and the principal about the fight, which was stopped after five to seven minutes. His meeting with the principal was postponed, and he left the building a few minutes later. He talked to another worker at the school for five to eight minutes as he left the building. On the way to his car, he heard a loud boom that sounded like a gunshot and saw the victim lying on the ground. He then saw a white car with two girls and a boy driving past him. He said about fifteen to twenty minutes elapsed from the time the fight was stopped to the time of the shooting.

Anika Glover testified that she was a student at South Side High School on October 27, 2000. Her cousin, Chevis Maxwell, was the defendant=s girlfriend, and she also knew the defendant from their days together in the band. Ms. Glover said that following the pep rally on the morning of the 27th, she and Ms. Maxwell drove her little sister to their aunt=s house in a white Ford Taurus that a cousin had rented. Upon returning to the school to pick up some friends, Ms. Glover thought she saw the defendant standing on a car. She drove over to the defendant, who was not wearing a shirt and had blood on his right leg. She said the defendant had no apparent difficulty walking or talking. The defendant demanded that she drive him to the Philsar, an apartment complex located on a street by that name. She said she initially refused to take him there but eventually gave in to his demand

after he screamed at her to take him to the apartments. On the way to the Philsar, he explained his injured condition by saying that some "hooks" or gang members had attacked him.

Ms. Glover testified that on the way to the apartment building, they stopped at a traffic light and that the defendant spoke to some friends in another car, telling them that some hooks had jumped on him. She said that although she did not remember his exact words, the defendant "was asking them I guess to ride with him or, you know, to go back and get revenge with him or whatever." These friends did not respond but drove away in the opposite direction. Upon arriving at the apartments, the defendant instructed her to drive around to the back where he got out of the car. While Ms. Glover was turning the car around, the defendant retrieved a long item wrapped in a piece of cloth from some bushes. She said that she thought that this item was a gun and that the defendant intended to do something bad. Ms. Maxwell had moved to the front passenger seat, and, against Ms. Glover's wishes, the defendant got into the backseat. He asked her to drive him to Ms. Terry Faulkner's house in the direction of the school, and she complied. As they were returning from the apartments, the defendant met other friends named Rico and Quincy. He told them what happened and asked if they would go with him. They also refused. When they saw the police, the defendant ducked down in the backseat and told her to calm down and to drive slower.

Ms. Glover testified that when they arrived on Lucille Avenue, traffic in front of her forced her to stop the car. She saw Mr. Holst and another boy walking down the sidewalk. She said that when she stopped, she saw the rear driver=s side door open and the defendant point the gun out of the car. Then she heard a gunshot. The defendant said nothing before he fired the gun. Before she knew whether anyone had been shot, she drove off with the defendant telling her where to drive. She said the entire trip to and from the Philsar took approximately ten minutes. She said that after the shooting, the defendant seemed angry and upset. She asked the defendant to get out of the car, but he replied that he could not. Minutes later, the defendant got out of the car near South Side High School and ran away from the crime scene, leaving the gun on the backseat. Ms. Glover then pulled into Ms. Faulkner's driveway and told Ms. Maxwell to do something with the gun. Ms. Glover said Ms. Maxwell and Ms. Faulkner=s son Chris wrapped the gun in some towels and threw it over the fence behind Ms. Faulkner=s house.

Chevis Maxwell testified that on October 27, 2000, she was the defendant's girlfriend and a student at South Side High School. She said that after the pep rally that morning, she went with her cousin, Anika Glover, to cash her paycheck. She said they returned to school twenty to twenty-five minutes later to find the fight over and the defendant's right leg "busted open" and bleeding. She said the defendant, who was a member of the Crips, explained to her that the boys in the car "threw" the Vice Lords' gang sign at him, he responded with his gang sign, and a fight ensued. She said that they stopped at a traffic light and waited there after it turned green while the defendant spoke with Johnny Martin, a fellow member of the Crips. She said that after he retrieved the gun, Ms. Glover told him she did not want to be involved with whatever was going on. Ms. Maxwell said that she tried to talk the defendant into going to the hospital to have his leg treated but that he refused because he was too upset. She said she reminded the defendant that they did not want to get into trouble in a rental car and told him they could get hurt. She said that as they left the apartments, they

saw Rico and Quincy. She said that the defendant told them he had been jumped and asked them if they were going to ride with him. Both Rico and Quincy were Crips, but neither responded to the defendant's request. She also said that in disposing of the gun, she wrapped it in the same towel that the defendant had used. On cross-examination, she agreed that the defendant was very upset.

Thirty-year-old Quentin Goodwin testified that on October 27, 2000, he and Terry Echols ate breakfast with Mr. Goodwin's mother at Lincoln Elementary School. Afterwards, Mr. Goodwin and Mr. Echols began walking to the house of Mr. Echols= grandmother. On the way, the defendant, whom Mr. Goodwin did not know, jumped out of the bushes and asked for their shirts, but they refused his request. The defendant's shirt was covered in blood, and he told them that he had been attacked by some AVLs@ and had just shot one. The defendant had cuts on his right shoulder and below his right knee. The defendant got a new shirt from someone in one of the houses down the road. He caught up with Mr. Goodwin and Mr. Echols and proceeded to walk with them. The police arrived and arrested all three of them.

Dr. Teresa Campbell testified as an expert in forensic pathology. She performed an autopsy on the victim. The victim had a 1.7 inch entrance wound in his left eye caused by shotgun pellets and some smaller pellet wounds on his face. For the most part, the pellets struck his face in a mass, but the smaller pellet wounds indicate that they were beginning to spread out as they struck the victim's face. The pellets destroyed the victim's eye, fractured his skull, and entered his brain. The victim died from severe brain lacerations, injuring the part of the brain that controls respiration and heart beat.

Donald Gray, a criminal investigator, testified for the defense that he was able to drive from the high school to the Philsar apartments in one minute, thirty seconds. He was able to drive from the high school to the rear of the Philsar in two minutes, forty-one seconds. His return trip lasted one minute, fifty-five seconds. He drove at the normal rate of speed.

Based upon this testimony, the jury convicted the defendant of first degree, premeditated murder.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his first degree murder conviction because the state did not prove premeditation. He argues that the shooting occurred within minutes of his being injured in a beating and that the state's witnesses said he was angry and upset before the shooting. He argues that he was not sufficiently free from excitement and passion as to be capable of premeditation. The state contends that the evidence reveals sufficient time and intervening circumstances from the fight to allow the defendant to make a decision to kill free from passion and excitement. We agree with the state.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier

-4-

of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

First degree, premeditated murder is defined as an unlawful, "premeditated and intentional killing of another." Tenn. Code Ann. §§ 39-13-201, -202(a)(1). Additionally, "premeditation" is defined as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. <u>Bland</u>, 958 S.W.2d at 660. Our supreme court has noted the following factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. <u>Id.</u>

The defendant contends that the evidence contains no proof that he decided to kill in the absence of passion. He states that he was beaten by a group of men and sustained a serious and bleeding leg wound. He argues that as a result, he immediately left the scene of the fight, retrieved a weapon, and returned. He claims that defense investigator Donald Gray testified that the trip from the school to the location of the weapon and back took a couple of minutes. He states that Ms. Glover and Ms. Maxwell, who were with him at the time of the shooting, said he was angry and upset. Finally, he notes that he shot the victim in broad daylight, hanging out of a car in front of many witnesses. He maintains that this evidence reveals that he was not free of passion and was unable to premeditate before the shooting.

The defendant likens the circumstances of this case to those in <u>State v. Boyd</u>, 909 S.W.2d 50, 55 (Tenn. Crim. App. 1995). In <u>Boyd</u>, this court reversed the defendant's attempted first degree murder conviction due to insufficient evidence of premeditation. The victim had sexually harassed the defendant for years. On the day of the offense, the victim made a sexual comment to the defendant who returned to her car, retrieved a gun, and shot the victim. The victim testified that it

took the defendant five to ten minutes to return with the gun. This court declined to uphold the conviction on these facts noting:

> When [the victim] made sexual references to [the defendant] on the day of the shooting, this simply got the best of her. In a fit of passion and with a hot temper, she retrieved her gun from her car, returned, and shot [the victim] one time. Instead of shooting him repeatedly, she stopped after one shot and ran into the house. She simply had reached her boiling point. Thereafter, she cooperated with the police and gave them no trouble.
>
> The state offered no other evidence of [the defendant's] attempted commission of a deliberate and premeditated murder.

Id. at 55. The defendant argues that like the defendant in Boyd, he had merely reached his boiling point, he shot the victim only once, and he cooperated with the police by giving them a statement.

We agree with the defendant that in order for a killing to be premeditated, the decision to kill must be made with a cool purpose "'or, if formed in passion, it must be executed after the passion has had time to subside.'" State v. Brown, 836 S.W.2d 530, 539 (Tenn. 1992) (quoting Rader v. State, 73 Tenn. 610, 619-20 (1880)). However, the circumstances in this case differ from those in Boyd, in which the defendant simply walked to her car and retrieved a gun. Viewing the evidence in the present case in the light most favorable to the state, James Holmes testified that he heard the gunshot fifteen to twenty minutes after the school staff broke up the fight. During this time period, the defendant enlisted Ms. Glover to take him to and from the Philsar apartments to retrieve the shotgun. Additionally, the record is devoid of evidence that the victim or Zain Holst did anything to provoke the defendant immediately before the shooting. Mr. Holst testified that he and the victim were not involved in the fight and did not speak or gesture to the defendant before the shooting. Rafielle McGhee testified that the victim was not armed.

Furthermore, aside from the evidence of procurement of a weapon and the time that elapsed before the shooting, the state provided other evidence that the defendant made a calculated decision to kill. Viewing the evidence in the light most favorable to the state, the jury could have found that the defendant spoke with Johnny Martin, a fellow Crip, at a traffic light on the way to the Philsar apartments; that he told Mr. Martin about the fight with the members of the other gang; and that he attempted to enlist Mr. Martin's help in what Ms. Glover characterized as seeking revenge. Ms. Maxwell testified that after he procured the shotgun from behind the Philsar apartments, Ms. Glover told the defendant she did not want to be involved in whatever was happening. Ms. Maxwell said she tried "to talk him down," reminding him that they were in a rental car and did not want to get in trouble, telling him that they could get hurt, and trying to convince him to go to the hospital. Both young women testified that the defendant spoke with friends named Rico and Quincy, whom Ms. Maxwell identified as fellow Crips, on the way out of the apartment complex. The defendant again recounted the earlier fight and asked Rico and Quincy whether they intended "to ride with him."

These conversations reflect that the defendant was capable of making a calm and calculated judgment about killing someone.

Additionally, the defendant made an effort to conceal his presence in the car with the shotgun from police officers. Ms. Glover testified that they encountered a police car when returning from the apartments. She said that the defendant told her to remain calm and drive slowly and that he lay down in the backseat. Although the record contains other evidence such as Ms. Glover's and Ms. Maxwell's testimony that the defendant was angry and upset, it was the jury's prerogative to accredit the state's theory of the case. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). The evidence is sufficient to support the jury's finding of premeditated, first degree murder.

## II. ADMISSIBILITY OF SIGNIFICANCE OF THE DEFENDANT'S TATTOOS

The defendant contends that the trial court erroneously ruled that the state could cross-examine him about whether one of the three teardrop-shaped tattoos on his face, allegedly obtained after his arrest in this case, meant in the gang culture that he had committed a homicide. He summarily argues that this line of questioning is irrelevant. He also argues that this evidence was confusing and prejudicial because the jury would have speculated on the meaning of his other two teardrop tattoos. He asserts that the trial court's erroneous ruling caused him to forego his constitutional right to testify. Finally, he argues that because the state waited until the middle of trial to move to call an expert about the meaning of his tattoo, he had no opportunity to secure his own expert to refute the state's expert. The state contends that the fact that the defendant got a tattoo signifying that he committed a homicide after he killed the victim is relevant to show that the victim's death was gang-related. It argues that the defendant's failure to make an offer of proof of his testimony on the significance of the tattoo prevented the trial court from ruling on whether the state could present expert rebuttal testimony about the meaning of the tattoo. We hold that the trial court properly ruled that the state could cross-examine the defendant about the meaning of the tattoo.

At the end of its proof, the state sought to call an expert in gang activity to testify about the meaning of one of the defendant's tattoos:

> [Prosecutor]: I guess if Your Honor will look at the defendant you'll note that he has three tear drops tattooed into the portion of–coming from his left eye. . . . . And they have been placed there since Michael Martin's death, since [the defendant] went–was taken into custody and he's not come out of jail since that time, since October 27th of 2000. . . . . Tear drops are, in gang culture, a sign if they are closed in the way the first one is that he has committed a homicide. It is well known, it's documented, it's been testified to, and just like certain gang tattoo[s], colors, gang signs that they gesture with their hands, a tear drop means something. And the State wants to put on . . . an expert . . . to testify [about] what his tear drop means.

The prosecutor observed that defense counsel had argued to the jury that the defendant was not contesting the fact that he shot the victim but instead contested only his mental state at the time of the shooting. Defense counsel objected to the state presenting expert testimony on the meaning of the tattoo, noting that the defendant had told him that the defendant got the tattoo because of his mother's death. The trial court initially declined to rule until it heard proof that the defendant did not get the tattoo until after the victim's death and a proffer of the expert's qualifications and testimony.

The defendant also argued that the state had given him no notice that it intended to call an expert on gang activity. The state maintained that it did not know about the defendant's teardrop tattoos until he removed a bandage covering them just before the jury entered at the start of the trial. The trial court observed that the defendant had filed a discovery motion requesting notification of the state's witnesses. It ruled that notwithstanding the state's belated discovery of the defendant's tattoos, the state could not call the proposed expert in its case-in-chief because of unfair surprise to the defendant. It ruled that the state could cross-examine the defendant about the meaning of the tattoos if he testified and that it would rule at that time on whether the defendant had opened the door to rebuttal testimony by the state's expert.

The state rested, and the defendant requested clarification of the court's ruling as it related to the defendant's testimony. He argued that the state's questioning him on whether his tattoo meant that he had killed someone was prejudicial regardless of his answer. He also contended that the tattoo was not relevant to the case. The state likened the tattoo to evidence of flight and argued that it was an admission by the defendant. The court stated that the evidence was relevant to the defendant's motive or intent in committing the killing. Defense counsel then proposed to voir dire the defendant on his waiving his right to testify, noting that he could not have the defendant testify without knowing the court's ruling on the issue. The court stated that it could not rule on the testimony without knowing what it would be: "I'm not going to pre-rule on the evidence until it's properly introduced during the course of the trial." The defendant made an offer of proof in which he said that he would have testified in his own behalf but that he agreed with his attorney's advice that he not testify in light of the court's ruling. The trial court again clarified its ruling, stating that if the defendant testified on cross-examination that the tattoo did not signify that he had killed someone, the state would be allowed to call an expert on rebuttal to testify about the meaning of the tattoo if the witness could qualify as an expert.

Just before the defense rested, the defense counsel stated for the record that he was not calling the defendant because of the court's ruling. The court then explained its ruling as follows:

> Let me state this for the record, membership or gang membership or whatever would be inadmissible if the only reason was to show that he had the propensity to commit the crime. But in this case . . . , we have testimony about him and possibly other gang members about a discussion of wanting them to go back and help him.

We have testimony about gang signs being given. We have testimony about a fight out there. And with all of that in mind my ruling, like I've said, is that it he's–if he does find that he has a right to do that, the State has a right to ask any questions on cross examination. They can ask the meaning of those tear drops on his face and as it may relate to any gang membership.

And his response, whatever his response will be I would make a ruling at that time as to whether or not rebuttal proof will be put on to prove–if (inaudible) qualify as an expert in gang activities and the testimony was going to be put on.

You can put on testimony to prove that a person committed a murder but that some type of gang membership or some type of advocation that shows symbols and signs of what a person–of a murder or whatever, that that's a symbol and sign of it.

The State would have a right to present rebuttal proof at that point.

The trial court stated that it found the proposed evidence relevant under Rule 401, Tenn. R. Evid., and that its probative value was not substantially outweighed by unfair prejudice under Rule 403, Tenn. R. Evid.

On appeal, the defendant and the state argue the merits of this issue under Rules 401 and 403. We believe that Rule 404(b) governs this issue. Rule 404(b) prohibits the introduction of evidence of other crimes or acts, except when the evidence is relevant to a litigated issue, such as identity, intent, or motive, and its probative value is not outweighed by the danger of unfair prejudice. The rule states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

-9-

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

The Advisory Commission Comment to the rule notes that under this procedure, the trial court must also find that the evidence of the other act is "clear and convincing" as required by State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985). When a trial court substantially complies with the procedural requirements of the rule, its determination will not be overturned absent an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

In the present case, the trial court conducted a series of discussions about the issue outside the jury's presence but did not analyze the issue under Rule 404(b), although it recognized the potential for the evidence in question to suggest that the defendant had the propensity to commit the crime. It also found that the significance of the tattoo was relevant to the defendant's motive or intent in shooting the victim. However, in weighing the probative value of the evidence against its potential for unfair prejudice, the trial court used the Rule 403 balancing test, requiring exclusion if the evidence's probative value is substantially outweighed by the potential for unfair prejudice, rather than the Rule 404(b) balancing test, requiring exclusion if the "probative value is outweighed by the danger of unfair prejudice." The Rule 404(b) balancing test is more favorable to the exclusion of the evidence. Because the trial court failed to apply the proper balancing test, we must now undertake to do so. See DuBose, 953 S.W.2d at 653 (observing that when the trial court fails to state the issue to which the disputed evidence is relevant and fails to weigh its probative value against the potential for unfair prejudice, "the determination of admissibility will be made by the reviewing court on the evidence presented at the jury out hearing").

We agree that evidence that the shooting was gang-related was relevant to the defendant's intent, which was the central issue at trial. Relevant evidence is that proof tending to establish a fact, bearing on the outcome of the action, as more or less probable than without that evidence. Tenn. R. Evid. 401. Although the state did not have to prove the defendant's motive, evidence that the killing was gang-related helped show that the defendant premeditated the shooting to retaliate against a rival gang. Turning to the balancing test, we look to whether the evidence's potential for unfair prejudice outweighs its probative value. Tenn. R. Evid. 404(b)(3). Evidence that the killing was gang-related is probative of premeditation. See, e.g., State v. G'Dongalay Parlo Berry, No. M1999-00824-CCA-R3-CD, Davidson County, slip op. at 13 (Tenn. Crim. App. Oct. 19, 2001) (holding that evidence of the defendant's participation in a gang was probative to prove an otherwise random killing was premeditated). We note, however, that in the present case, the probative value of the significance of the defendant's tattoo is somewhat lessened by the presence of other evidence, including the defendant's admission to Quentin Goodwin, suggesting the shooting was gang-related.

Our supreme court has stated that unfair prejudice is "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Committee Note). We believe the evidence was only minimally prejudicial because the defendant did not contest the fact that he killed the victim. The defendant argues that the evidence was prejudicial because he had

-10-

three teardrop-shaped tattoos from which the jury could have inferred that he had committed other homicides. The state's argument to the trial court suggests that the tattoo allegedly signifying a homicide was closed in a certain way and, thus, distinct from the other two. The defendant did not make this argument to the trial court and, thus, we do not have the benefit of the trial court's ruling on the likelihood that the jury could have inferred other homicides from the defendant's additional tattoos. See State v. Miller, 668 S.W.2d 281, 285 (Tenn. 1984) (holding generally that a party may not object to the admission of evidence on one ground at trial and another ground on appeal). Without additional development of the appearance of the other tattoos in the record, we cannot say that the potential for unfair prejudice from the evidence of the significance of the defendant's teardrop-shaped tattoo outweighed its probative value under the 404(b) balancing test. Thus, the trial court did not err in ruling that the state could cross-examine the defendant about the tattoo and potentially call an expert witness on rebuttal, providing the witness could qualify as an expert.

The defendant also argues that the state's belated notice that it intended to call an expert to testify about the meaning of his tattoo prevented him from securing his own expert to refute the state's expert. The admission of rebuttal evidence is discretionary with the trial court and will not be upset on appeal unless the face of the record reveals a clear abuse of discretion. State v. Dellinger, 79 S.W.3d 458, 488 (Tenn. 2002). The trial court recognized that the state did not know of the defendant's tattoo until the trial began, but it did not allow the state to call an expert on gang activity during the state's case-in-chief because of lack of notice to the defendant. It ruled that the state could attempt to qualify the expert for rebuttal testimony depending upon the defendant's answer when cross-examined about the meaning of his tattoo.

Initially, we note that generally a defendant's request to discover the names of the state's witnesses does not apply to witnesses the state calls in rebuttal because a contrary rule would require the state to anticipate every conceivable issue the defendant might raise. State v. Teel, 793 S.W.2d 236, 246 (Tenn. 1990). In the present case though, the state's need for this rebuttal witness was generated by the question that it intended to ask the defendant on cross-examination. The record reveals that the state did not know it would call the expert until it saw the defendant's tattoos at trial. The defendant learned of the state's intent to call the expert the next day at the end of the state's proof. Thus, he did receive some advance notice of the state's intent to use an expert on gang activity in rebuttal. Furthermore, although he now complains that he did not have time to find an expert witness to testify on surrebuttal, the record does not reflect that he requested a continuance in the event that the state did call the expert in order to secure his own expert. This forecloses the defendant's claim on appeal that the timing of the state's notice prevented him from securing an expert. See T.R.A.P. 36(a); Dellinger, 79 S.W.3d at 489 (holding that the defendant's failure to indicate he intended to call an expert in surrebuttal or to request a continuance waived his argument on appeal that he was prevented from calling his own expert because the state gave no notice of its rebuttal expert). The defendant is not entitled to relief on this issue.

### III. ADMISSIBILITY OF AUTOPSY PHOTOGRAPHS

The defense contends that the trial court erred in admitting an autopsy photograph of the victim's forehead and scalp and another of the victim's neck. He argues that the trial court should have excluded the photographs because they are gruesome and not probative of any contested issue in the case and because any probative value was substantially outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 403. The state contends that the photographs corroborate the testimony of the medical examiner and prove the victim's death as well as the way in which he died. The state also argues the defendant was not unfairly prejudiced because the photographs are not gruesome or horrifying. We agree with the state.

At trial, the state sought to introduce certain photographs. One photograph depicts several pellet-sized wounds on the victim's forehead and scalp. The other photograph shows a few small wounds on his cheek and an abrasion on the back of the victim's neck consistent with striking the ground after being shot. The defendant objected to these photographs, claiming that they were irrelevant. The trial court ruled that the photographs were relevant and their probative value outweighed any unfair prejudice.

The admissibility of photographs is a matter committed to the discretion of the trial court and will not be overturned on appeal without a clear showing of abuse of that discretion. State v. Porterfield, 746 S.W.2d 441, 450 (Tenn. 1988). The leading case regarding the admissibility of photographs is State v. Banks, 564 S.W.2d 947 (Tenn. 1978), in which the supreme court held that the admissibility of photographs of murder victims is within the discretion of the trial court after considering the relevance, probative value, and potential unfair prejudicial effect of such evidence. Generally, "photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." Id. at 950-51. The probative value of the evidence must be weighed against any unfair prejudice the defendant will suffer in admitting the evidence, and only if the unfair prejudice substantially outweighs the probative value may the evidence be excluded. Id. at 951.

As discussed in the previous section, evidence is relevant when it has any tendency to establish a fact, bearing on the outcome of the action, as more or less probable than without that evidence. Tenn. R. Evid. 401. Specifically, evidence can be relevant if it aids the testimony of the medical examiner. See State v. Bush, 942 S.W.2d 489, 515 (Tenn. 1997) (holding that photographs were relevant to supplement the testimony of the medical examiner and investigative officers in showing the cause of death and the violence of the attack); see, e.g., State v. Barnard, 899 S.W.2d 617, 623 (Tenn. Crim. App. 1994). In the present case, the state sought to introduce the photographs through the testimony of the medical examiner and used them to explain her statement of the victim's injuries. We note that the pictures' probative value is somewhat diminished by the abundance of other evidence in the case. The medical examiner gave extensive testimony of the victim's injuries and even provided a diagram of those injuries. Also, the defendant does not contest the victim's cause and manner of death. However, the photographs do have some relevance because they corroborate the medical examiner's testimony that the pellets were just beginning to spread out

as they struck the victim's face. This indicates that the defendant and victim were close at the time of the shooting, supporting the inference that the defendant knew the victim was unarmed, a factor demonstrating the existence of premeditation. Also, the photograph of the victim's forehead and scalp corroborates Zain Holst's testimony that he and the victim ducked down before the defendant fired.

Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. In weighing the probative value of the photographs against their risk of unfair prejudice, the record supports the trial court's finding that the photographs are not particularly gruesome. The victim was shot through his left eye, and the majority of his injuries occurred there. The photographs in question do not show the large entrance wound on the left side of the victim's face. One photograph shows part of the victim's left cheek but was taken from such an angle that the large entrance wound cannot be seen. Other than the victim's hair being shaved to show some pellet wounds in his scalp, the photographs do not show the victim in an altered condition due to the autopsy. In State v. McCall, 698 S.W.2d 643, 648 (Tenn. Crim. App. 1985), this court held that a photograph of the victim's wounds after his body was cleaned from its "bloody and gory condition" was admissible. Similarly, the photographs in the present case do not show the victim's body in a bloody or gory condition.

The trial court found that the photographs were relevant and that their probative value outweighed any unfair prejudice to the defendant resulting from admitting them. The record reflects that the state had multiple photographs and did not submit many of them due to their gruesome nature. The trial court agreed that certain photographs of the victim would be too prejudicial and did not admit them into evidence. The state also tried to admit an x-ray of the pellets inside the victim's skull, but the judge ruled that the x-ray would be cumulative to the photographs and diagram already admitted and that the potential prejudice outweighed the probative value. We are unable to conclude that the trial court abused its discretion in ruling that the probative value of the photographs in question was not substantially outweighed by the risk of unfair prejudice.

## IV. PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENT

Finally, the defendant contends that the trial court erroneously allowed the prosecutor to imply during her rebuttal closing argument that he would receive no jail time if he was convicted of anything less than first degree murder. He argues that the trial court should have given a curative instruction on the amount of jail time he would receive if convicted of second degree murder or voluntary manslaughter. The state contends that the prosecutor's argument was not improper. We believe the defendant is not entitled to relief.

The Tennessee Supreme Court has recognized that "argument of counsel is a valuable privilege that should not be unduly restricted." Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975). Attorneys have great leeway in arguing before a jury, and the trial court's broad discretion in controlling their arguments will be reversed only upon an abuse of discretion. Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001). However, closing argument must be "temperate, must be predicated

on evidence introduced during the trial of the case and must be pertinent to the issues being tried." Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976). Prosecutorial misconduct does not constitute reversible error unless the outcome was affected to the defendant's prejudice. State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001). In Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), this court set out the following considerations for determining whether the state's conduct could have improperly prejudiced the defendant and affected the verdict:

> 1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
>
> 2. The curative measures undertaken by the court and the prosecution.
>
> 3. The intent of the prosecutor in making the improper statement.
>
> 4. The cumulative effect of the improper conduct and any other errors in the record.
>
> 5. The relative strength or weakness of the case.

See also State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984) (approving these factors in determining if the misconduct resulted in reversible error).

In rebuttal to the defense's closing argument, the prosecutor stated the following:

> People – an act like Demond Gardner did on October 27th, people like that had no more regard for a life of a young man like Michael Martin than Demond Gardner showed do need to go to jail. I'm not ashamed to say that, not ashamed to ask you to do that, and to do that for an amount of time that fits the crime.

The defendant objected to what this statement implied without explaining what he thought it implied. The trial court responded by telling the jury that arguments of counsel are not evidence and that it would charge the jury according to the law. It also told the prosecutor that she could rephrase her argument. She proceeded with her next point.

The defendant contends that the statement by the prosecutor implied that the jury would have to convict the defendant of first degree murder in order for him to receive a sentence involving jail time. He argues that the statement caused the jury to believe that if it convicted him of a lesser offense, he would be placed on probation. The defendant concludes that this statement prejudiced him because the evidence of premeditation was weak and the statement influenced the jury in finding him guilty of first degree murder. He also contends that the trial court's curative instruction was inadequate because it did not include the amount of time he would serve if convicted of second degree murder or voluntary manslaughter. In reviewing the record, the implications stated by the

-14-

defendant are not the most logical reading of the prosecutor's statement. An "amount of time that fits the crime" implies that the defendant could be sentenced to different amounts of jail time depending on the crime of which he is convicted. We do not believe that it implies the defendant would serve no jail time unless convicted of first degree murder. Because we conclude that the statement was not erroneous, we perceive no problem with the trial court's curative instruction.

Based upon the foregoing and the record as a whole, we affirm the judgment of conviction.

_____
JOSEPH M. TIPTON, JUDGE