IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

FEBRUARY 1997 SESSION



**FILED**

**February 4, 1999**

**Cecil Crowson, Jr.**
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 03C01-9608-CR-00302 |
| | ) | |
| | ) | Hamilton County |
| v. | ) | |
| | ) | Honorable Stephen M. Bevil, Judge |
| | ) | |
| CHARLES FRANK BANKSTON, | ) | (Second degree murder and reckless |
| | ) | endangerment with a deadly weapon) |
| | ) | |
| Appellant. | ) | |

For the Appellant:

Don W. Poole
732 Cherry Street
Chattanooga, TN 37402

For the Appellee:

Charles W. Burson
Attorney General of Tennessee
        and
Elizabeth T. Ryan
Assistant Attorney General of Tennessee
425 Fifth Avenue North
2d Floor, Cordell Hull Building
Nashville, TN 37243-0493

William H. Cox
District Attorney General
        and
David Denny
Assistant District Attorney General
600 Market Street
Chattanooga, TN 37402

OPINION FILED:_____

CONVICTIONS AFFIRMED; SENTENCE FOR SECOND DEGREE MURDER
MODIFIED

Joseph M. Tipton
Judge

**O P I N I O N**

The defendant, Charles Frank Bankston, appeals as of right following his convictions by a jury in the Criminal Court of Hamilton County of second degree murder, a Class A felony, and reckless endangerment with a deadly weapon, a Class E felony. He received sentences of twenty-five years and two years to be served concurrently in the custody of the Department of Correction. The defendant presents the following issues for our review:

(1) whether the indictment is sufficient;

(2) whether the evidence is sufficient to support the defendant's convictions;

(3) whether the trial court erred by denying the defendant's motion for a change of venue;

(4) whether the defendant was denied a fair trial when the trial court limited the defendant's questioning of two potential jurors during voir dire;

(5) whether the trial court erred by failing to dismiss the case on the grounds of double jeopardy;

(6) whether the trial court erred by refusing to allow testimony and refusing to instruct the jury regarding the legal presumptions of people with certain blood alcohol levels;

(7) whether the trial court erred in its charge to the jury regarding multiple indictments and the definitions of reckless and knowing;

(8) whether the statute providing for instructing the jury about parole eligibility, T.C.A. § 40-35-201(b), is unconstitutional;

(9) whether the trial court erred in its charge to the jury by incorrectly calculating the minimum number of years the defendant would spend in jail;

(10) whether the trial court erred by admitting certain evidence at the sentencing hearing; and

(11) whether the trial court erred in sentencing by applying certain aggravating factors, failing to apply certain mitigating factors, and imposing an excessive sentence.

2

We conclude that the convictions should be affirmed but the sentence for second degree murder should be modified.

Steve Gentry testified that on August 26, 1994, he and his friend, Dr. Don Jezewski, met at the Ocean Avenue Cafe in Chattanooga at about 6:15 p.m. He said they each drank about six bourbon and cokes and ate a sampler platter, which is a large dish. He said they left the restaurant at about 8:45 p.m. and went toward Jezewski's car in the parking lot. He said that as they were walking, Jezewski saw the defendant, whom neither of them knew, and said the defendant was too drunk to drive. He said Jezewski suggested they talk to the defendant.

Gentry testified that the defendant was driving a red Camaro. He said that Jezewski approached the defendant and told him, "My friend, I think you shouldn't be driving home. You've had too much to drink." He said Jezewski was not threatening the defendant. He said the Camaro door on the driver's side was open, and he and Jezewski were standing in the doorway. He testified that the defendant replied that he was fine and could drive. He said the defendant was slurring his words. He said that the conversation between Jezewski and the defendant was pleasant. Gentry testified that he told the defendant his car was pretty, and it would be a shame to mess it up. He said Jezewski asked the defendant where he lived and offered to drive the defendant home. He said the defendant refused, insisting that he was fine to drive. He said the defendant appeared to understand everything they were saying to him, and he gave logical responses to their questions.

Gentry testified that after Jezewski offered to pay for a taxi cab to drive the defendant home, which he refused, the defendant started to back up. Gentry stated that the driver's side door was open, and Jezewski told the defendant he was not going to let him close his door. He said the tone of the conversation between the two men

was still pleasant. He said the defendant continued to back out, and his door became wedged between the front and back door of an adjacent car, causing the defendant's car to become stuck. Gentry said the defendant continued to accelerate, causing his wheels to spin, and he told Jezewski that they should let the defendant drive home. He testified that the defendant then let up on the gas and accelerated quickly, causing the driver's side door side to bend back then disengage, hitting him and Jezewski. He said the force of the hit knocked him across the parking lot. He said that when he got up, he saw Jezewski lying under the defendant's car, and the back right wheel of the defendant's car ran over Jezewski. He said the defendant had to accelerate to do this.

Gentry testified that Jezewski sat up, looked around, and saw that blood was coming from his mouth. He said he went over to Jezewski and asked him if he was all right, but Jezewski lay back down. He said he called for an ambulance and in the meantime, the defendant veered to the left, struck another car, and he left the parking lot. Gentry said that nothing was obstructing the defendant's view of Jezewski. He said that he drank with Jezewski on several occasions and that Jezewski never became belligerent or confrontational when he drank. He said he sustained one broken rib and a bruised growth plate in his rib as a result of the accident.

On cross-examination, Gentry admitted that he and Jezewski each had six drinks. He said that Jezewski weighed about two hundred and forty pounds, and he weighs two hundred and twenty pounds. He admitted that he did not see the defendant as the defendant was getting into his car and that he relied on Jezewski's initial observations of the defendant. Gentry said the defendant's slurred speech was the reason he decided the defendant should not be driving. He said he did not see the defendant walk nor did he smell alcohol on the defendant. He said the parking lot was close to a freeway and that it was noisy.

Tracy Cook testified that he arrived at the Ocean Avenue Cafe around 5:30 p.m. and left at around 9:00 p.m. He said that as he entered the parking lot, he saw a car that appeared to be in reverse, and the driver was accelerating. He said there was smoke coming from the back of the car. He said that two men were leaning over talking to the driver. He said that one of the men was leaning into the car. He said the defendant disengaged the brake, throwing one man across the parking lot and knocking the other over. He said that Jezewski looked like he was trying to move away from the front of the Camaro. He said Jezewski was getting up on all fours, his knees were off the ground, and he was almost standing up when the Camaro went forward and ran over Jezewski. He said the Camaro continued and hit another car, and his wife got the defendant's license plate number. He said that when he went to check on Jezewski, he was semiconscious and was trying to talk. He said he had an unobstructed view of Jezewski before he was hit, and he did not see anything that would prevent the defendant from seeing Jezewski.

On cross-examination, Cook admitted he had four or five beers, possibly as many as seven, between the hours of 6:00 and 9:00 p.m. He said that he had a small buzz. He also said Jezewski was leaning close to the defendant inside the car.

Randy Murray testified that he arrived at the Ocean Avenue Cafe at about 5:00 p.m. and had a seafood salad and three drinks. He said that when he went to the parking lot, he heard tires squealing. He said the defendant floored the accelerator while the car was in reverse, throwing Jezewski into the middle of the parking lot. He said the defendant then moved forward at a regular pace. He said Jezewski was on his hands and knees getting up when the defendant ran over him. He said Jezewski was able partially to stand up before he was hit, and Jezewski's hands were on the hood of the car. He said the defendant accelerated as fast as he could go when he ran over Jezewski.

5

On cross-examination, Murray admitted that he had one beer at a golf course the afternoon of the accident. He said the defendant's car door appeared closed. He admitted giving a statement to the police in which he said the Camaro came to a stop while backing up, then someone jumped in front of the Camaro. He said he meant that Jezewski was on his hands and knees and jumped up from the pavement so the defendant could see him.

Sheila Murray testified that she met Randy Murray at the restaurant at about 8:00 p.m. She said she did not have anything to drink that night. She said when they went to the parking lot, she heard the defendant revving his engine. She said she saw Gentry and Jezewski standing between the defendant's car and another car. She said the defendant sped backwards, causing Gentry to be thrown to the back of the car and Jezewski to be thrown in front. She said there was nothing obstructing the defendant's view. She said Jezewski was off the ground and in front of the Camaro, and he either had his hands on the car or was trying to get his hands on the car when the defendant ran over him.

Herman Stout testified that he had about five or six beers at the restaurant that night, along with appetizers and a meal. He said that when he went to the parking lot, he saw the defendant's car go backwards, slinging Jezewski into the middle of the parking lot. He said there was nothing obstructing the defendant's view. He said the defendant went forward and ran over Jezewski, who was on his hands and knees. On cross-examination he admitted that the defendant appeared to drive fine when he left the parking lot. He also admitted that in his report to the police, he did not write that the defendant ran over Jezewski.

Dr. Frank King, the medical examiner for Hamilton County, testified that he examined Jezewski's body and determined that Jezewski died of multiple injuries.

6

He said Jezewski had multiple abrasions, bruises, and bone fractures. He said Jezewski's chest cavity was crushed, he had a fractured pelvis, and there was bleeding in his body, chest cavity, and pelvis. He said Jezewski's blood alcohol content based on a blood sample was .05 percent, and a vitreous fluid sample test registered .07. He said that an earlier blood alcohol test performed at 9:40 p.m. when Jezewski was admitted to the hospital registered .10 percent. He said Jezewski weighed two hundred and twenty-six pounds.

On cross-examination, Dr. King said that Jezewski's blood alcohol content was probably .11 to .12 percent at the time of the accident. He said blood alcohol content at that level can cause decreased inhibition, altered judgment, slowed reaction time, incoordination, slurred speech, and sedation. He said Jezewski's blood alcohol content indicated that he had between six and eight drinks within a two and one-half hour period. He said the impact that caused Jezewski's death was a very low speed impact. He testified that if a person weighing one hundred and sixty to one hundred and seventy pounds drank two beers in two hours after consuming four to five beers four hours earlier, that person's blood alcohol content would be less than .05 percent.

Officer William Neblette of the Chattanooga Police Department's D.U.I. Task Force testified that he took pictures and interviewed witnesses at the scene. He said that none of the witnesses appeared drunk or impaired. He said Officer Robert Simpson notified him that the defendant's car had been located, and he went to the defendant's house. He said that when he arrived, Officer Simpson had the defendant in custody in Simpson's car. He said he went to talk to the defendant and as soon as he opened the door, he noticed the odor of alcohol. He said the defendant's head was moving from side to side, his eyes were watery and bloodshot, and he seemed unsteady. He said he would not have wanted to drive on the same road as the defendant that night.

7

Officer Neblette testified that he saw the defendant later that night in jail. He said the defendant was as impaired if not more impaired than he was earlier that night. He said the defendant was unsteady, his eyes were watery and bloodshot, his speech was affected, and he smelled strongly of alcohol.

On cross-examination, Officer Neblette said that six drinks would probably result in a blood alcohol content of close to .10 percent. He admitted that he did not ask any of the witnesses how much they had to drink that night. He said one of the factors he used to determine that the defendant was intoxicated was the defendant's speech.

Officer Robert Simpson, also of the D.U.I. Task Force, testified that he located the defendant's car at the defendant's house. He said that when the defendant came to the door, he was eating a sandwich and seemed surprised to see a police officer. He said the defendant smelled of alcohol, his speech was muddled, and there was a small abrasion on his forehead. He said that his police car had video equipment and that he wore a wireless microphone and recorded his conversation with the defendant that night.

The jury listened to the audio portion of the tape because the camera was pointed away from the defendant during the conversation. In the audiotape, Officer Simpson asked the defendant how his car became damaged. The defendant responded that earlier that night, he thought he was going to be robbed. He told Officer Simpson that two men were at Ocean Avenue and approached him. He said he told the men he was going home, but the men told him they wanted to talk to him. He said he told them no, pushed the gas, and the tires squealed. The defendant said he told the men to get out of the way, backed up, put the car in drive, then went forward and hit one of the men. He admitted that he had something to drink after he came home. He

8

laughed and told Officer Simpson that his address was too easy to find. Officer Simpson testified that it was obvious the defendant was drunk. He said he arrested the defendant for being drunk in public in order to keep the defendant from leaving.

On cross-examination, Officer Simpson said that one reason he thought the defendant was intoxicated was because of the defendant's muddled speech. He said the defendant's car was not hidden from view. He also said the defendant told him he had hit somebody, not run over somebody. He said he saw a liquor bottle on the table but no other evidence that the defendant had anything to drink at his house.

William Polen, Jr., an audiologist, testified that he treated the defendant in 1985 because the defendant complained of dizziness. He said the defendant had mild high frequency hearing loss in his right ear and moderately severe high frequency hearing loss in his left ear. He said the defendant also had a slight difference in speech discrimination ability between his right and left ear, with his left ear being worse. He said the defendant had difficulty detecting the presence of high frequency or high pitch sounds. He said this type of hearing loss would cause one to have difficulty distinguishing between words that sound alike. He said the defendant would have more difficulty hearing and understanding others when there was background noise, including traffic noise. He said that subsequent testing by other doctors revealed a general worsening of the defendant's ability to hear sounds in the high frequency range.

On cross-examination, Polen admitted that male voices generally have a lower pitch and fundamental frequency. He said he had not examined the defendant within the last year.

Carolyn Hogan, the defendant's sister, testified that the defendant had lived with her since the accident. She testified that the defendant has a daughter and a

granddaughter.  She said the defendant could not hear very well, and she had to repeat everything two or three times.  She also said the defendant has had a stuttering problem all of his life.

George Griggs, an acquaintance of the defendant, testified that he was at the Ocean Avenue Cafe the night of the incident.  He said he saw the defendant at about 6:30 or 7:00 p.m.  He said he talked to the defendant for about two minutes, and the defendant did not have any problem talking to him and did not smell of alcohol.  On cross-examination, he admitted telling a detective that he had not been around the defendant enough in the past to know if the defendant had been drinking that night.

Kimberly Edwards testified that she was working as a waitress at the Ocean Avenue Cafe the night of the accident, and she waited on the defendant.  She testified that it was happy hour when he arrived, during which customers would receive two shots of liquor for the price of one or discounts on beer.  She said she served the defendant two beers.  She said she had training to recognize people who have had too much to drink.  She said the defendant did not look like he had too much to drink.

On cross-examination, Edwards testified that the defendant could have ordered drinks from the bar without her knowledge.  She admitted that the seafood sampler is a huge platter, and some people order it as a meal for two people to share.  She said the management of the restaurant was concerned with whether impaired people were served, and the managers asked her to write a statement detailing her actions on the night of the accident.  She said she was aware that the restaurant was being sued, although she was not aware the lawsuit was for ten million dollars.  She said the defendant did not pay for his drinks that night.

The defendant testified that on the day of the accident, he ran errands then went to the pool from 2:30 to 4:00 p.m. He said he drank two beers during this time. He said he went into Georgia to play the lottery then arrived at the Ocean Avenue Cafe around 7:00 p.m. He said he saw some people he knew at the restaurant, then he sat down and drank two beers. He said he decided to leave at about 9:00 p.m. because he had to get up early for work the next morning. He said he thought he had paid for his drinks.

He said he got into his car in the parking lot, and Jezewski and Gentry approached him. He said he did not know them and had never seen them before. He said he thought he was going to be carjacked and robbed. He testified that they said they wanted to talk to him, but he told them he did not want to, and he was going home. He said he could not hear all of their conversation. He said he asked them several times to move out of the way because they were standing in the door preventing him from shutting the door. He said both men were talking and the freeway was close. He said he started the car, put it in reverse, and held the brake to "squall" the tires, hoping they might leave. He said one of the men then told him to get out of the car and reached inside the car. He said he took his foot off of the brake, went backwards, hit the man standing in the door, and hit his head on the mirror. He said his car door became stuck on the adjacent car. He said he did not know what was happening, and he started forward and hit the adjacent car with his door. He said he did not see anyone in front of him after he pulled out, and he did not knowingly run over anyone. He said he did not know that he had run over anyone when he went home.

He said that when he arrived home, he had two big drinks of whisky because he was "scared to death." He said he started to change clothes and fix himself a sandwich when he decided to call the police. He said an officer showed up before he could make the call. He said he did not know that he had run over Jezewski.

11

On cross-examination, the defendant admitted that he told Officer Simpson he had hit someone. He said he meant to say that he hit the man while he was backing up. He admitted that he never stopped to call 9-1-1. He admitted that neither Gentry nor Jezewski had any weapons. He said that he did not tell Officer Simpson about the beers he drank earlier in the day.

The stipulated testimony of FBI Agent Wayne Jackson was admitted into evidence. Jackson defined the federal crime of carjacking.

Marla Clingman testified that she was the manager of a convenience store in Georgia. She said the defendant would come into her store almost daily to play the lottery, and he came in between 5:30 and 6:00 p.m. the day of the accident. She said he stayed about fifteen or twenty minutes. She said he did not buy anything to drink, and he did not demonstrate that he had been drinking that day. On cross-examination, she admitted that she was not trained to detect impairment.

## I. SUFFICIENCY OF THE RECKLESS ENDANGERMENT INDICTMENT

The defendant contends that the indictment charging reckless endangerment is insufficient because it does not name a specific victim. In the heading for this argument in the defendant's brief, he states that the trial court erred in its charge to the jury regarding the reckless endangerment indictment. However, his argument is really two-fold: that the indictment is insufficient because it fails to name a specific victim, and that the jury could have erroneously concluded that the reckless endangerment charge applied to Jezewski. He argues that the jury could have erroneously convicted the defendant of both second degree murder and reckless endangerment of Jezewski. The state contends that the indictment is sufficient and that the jurors were adequately apprised that the reckless endangerment charge applied only to Gentry.

12

Initially, we note that an objection to the indictment should have been made in a pretrial motion, and the failure to do so may constitute a waiver. See Tenn. R. Crim. P. 12(b), (f). In any event, the defendant's contention is without merit. The indictment alleged that the defendant "did unlawfully and recklessly engage in conduct which placed or may place another person in imminent danger of death or serious bodily injury . . . ." Both the state and the defendant proceeded at trial on the theory that Gentry was the victim of reckless endangerment. Furthermore, there was no risk that the jury was confused and erroneously convicted the defendant for the reckless endangerment of Jezewski because the trial court instructed the jury that the reckless endangerment charge applied only to Gentry. Thus, we conclude that the issue is waived, and even if it were not, it is without merit.

## II. SUFFICIENCY OF THE EVIDENCE

The defendant argues that the evidence is insufficient to support his convictions for second degree murder and reckless endangerment with a deadly weapon and that the verdicts are against the weight of the evidence. With respect to the second degree murder conviction, he contends that there is insufficient evidence to support a finding that he knowingly ran over Jezewski. With respect to the reckless endangerment conviction, he contends that the evidence is insufficient to show that he acted recklessly and that the evidence merely shows that he was trying to get away from the victims whom he believed were threatening him. The state argues that the evidence is sufficient.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence, but presume that

13

the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

Second degree murder is defined as a knowing killing of another. T.C.A. § 39-13-210(a)(1). "A person acts knowingly with respect to the result of that person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b). We conclude that the evidence is sufficient to support a finding that the defendant acted knowingly. The evidence presented shows that Jezewski, who was over six feet tall and weighed about two hundred and forty pounds, was either upright or almost upright when the defendant ran over him with his Camaro, a car that sits low to the ground. Several witnesses testified that there was nothing blocking the defendant's view of Jezewski. Based on this evidence, the jury could have concluded that the defendant knowingly ran over Jezewski.

The evidence is also sufficient to support a conviction of reckless endangerment. Reckless endangerment occurs when a person "recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury" and is a felony when committed with a deadly weapon. T.C.A. § 39-13-103. A person acts recklessly when he is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. T.C.A. § 39-11-302(c). "The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under the circumstances as viewed from the accused person's standpoint." Id.

The evidence presented shows that the defendant attempted to back out of the parking lot while Gentry was standing in his doorway. When the defendant

14

backed out, his door became stuck in an adjacent car. The defendant then continued to accelerate in an attempt to disengage his door while Gentry was still standing in the doorway. When the defendant finally disengaged his door, the impact caused Gentry to be thrown across the parking lot. Based on this evidence, the jury could have concluded that the defendant acted recklessly. Although the defendant argues that he presented evidence that he was frightened of the victims and was trying to escape, the jury accredited the testimony of the state's witnesses, and its decision will not be disturbed on appeal.

Finally, we conclude that the trial court did not fail in its capacity as the thirteenth juror. Once the trial court approves the verdict as the thirteenth juror and imposes judgment, the review of the evidence on appeal is quite limited, requiring us to "accredit the testimony of the witnesses for the state and resolve the evidentiary conflicts in favor of the state." State v. Burlison, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993) (citation omitted). When viewed in this light, we conclude that the trial court did not err by refusing to set aside the verdict or grant the defendant a new trial.

### III. CHANGE OF VENUE

The defendant contends that the trial court should have granted his motion for a change of venue based upon the deluge of prejudicial media coverage surrounding the incident. He argues that because the publicity permeated Hamilton County through television, radio and newspapers, it was impossible for him to receive a fair trial, and the jury's verdicts of guilt demonstrate that he was prejudiced. He contends that even if actual prejudice is not shown, the convictions must be set aside based on the totality of the circumstances. The state argues initially that the defendant waived the issue by failing to prepare an adequate appellate record that shows he used all of his peremptory challenges. The state argues that if the issue is not waived, it is nevertheless without merit because the trial court excused all potential jurors who had

15

read or seen something about the case in the media and could not put it aside. Furthermore, the state contends that the defendant failed to show prejudice.

With respect to the defendant failing to prepare an adequate record on appeal, the state asserts that the defendant must show that he used all of his peremptory challenges before he can complain about jurors' qualifications. See Sommerville v. State, 521 S.W.2d 792, 797 (Tenn. 1975). We agree that the record is unclear about the defendant's challenges. Nevertheless, we will address the merits of the issue presented.

The decision of whether to grant a motion for a change of venue based on pretrial publicity rests within the sound discretion of the trial court and will not be reversed on appeal unless the trial court abused its discretion. State v. Howell, 868 S.W.2d 238, 249 (Tenn. 1993). Furthermore, the defendant must show that the jurors were biased or prejudiced against him before his conviction will be overturned on appeal. State v. Melson, 638 S.W.2d 342, 360-61 (Tenn. 1992). Mere exposure to news accounts of the incident does not, standing alone, establish bias or prejudice. Prospective jurors can have knowledge of the facts surrounding the crime and still be qualified to sit on the jury. State v. Bates, 804 S.W.2d 868, 877 (Tenn. 1991). The test is "whether the jurors who actually sat and rendered verdicts were prejudiced by the pretrial publicity." State v. Kyger, 787 S.W.2d 13, 18-19 (Tenn. Crim. App. 1989).

We conclude that the trial court did not abuse its discretion by denying the defendant's motion for a change of venue. During voir dire, each prospective juror was asked if he or she knew anything about the case from the media. If a juror indicated that he or she had read, heard, or seen something, both the attorneys and the trial court questioned the prospective juror on exactly what he or she had heard. Most prospective jurors said that they vaguely remembered hearing or reading about the

16

incident, but most could not provide details. Several prospective jurors said they did not know anything about the case. The trial court also asked the prospective jurors if they had formed an opinion on the defendant's guilt or innocence based on what they had heard and whether they could set aside what they had heard and decide the case based on the evidence at trial. Prospective jurors who indicated that they had formed an opinion regarding the defendant's guilt or innocence or could not set aside what they had heard in the media were excused. Each juror that actually heard the case told the trial court that they could listen to the evidence and make a decision on the defendant's guilt or innocence based on that evidence.

We do not dispute the fact that the incident garnered a lot of media coverage. One radio station in Chattanooga ran fifty-two news stories, and both newspapers in Chattanooga printed a combined forty-four stories. However, as this court has previously recognized, a defendant who commits a serious crime cannot be expected to remain anonymous in the community. State v. Griffis, 964 S.W.2d 577, 597 (Tenn. Crim. App. 1997). Based on our review of the trial court's proceedings during voir dire, we conclude that it did not abuse its discretion by denying the defendant's motion for a change of venue. In addition, the defendant has failed to establish that the jurors selected to serve during his trial were biased or prejudiced against him in light of the fact that all jurors empaneled expressed that they could listen to the evidence and base their verdicts on the evidence presented at trial.

## IV. VOIR DIRE OF PROSPECTIVE JURORS

The defendant contends that the trial court abused its discretion by refusing to allow him to voir dire certain prospective jurors individually regarding whether they felt the defendant could receive a fair trial in Hamilton County. Specifically, he argues that a prospective juror's testimony regarding the ability of the defendant to receive a fair trial amounts to an affidavit averring undue excitement,

which can be grounds for a change of venue.  See Tenn. R. Crim. P. 21(b).  The state argues that the trial court did not abuse its discretion.

The control of the voir dire is within the sound discretion of the trial court and will not be found to be error unless the defendant shows that he was prejudiced. Howell, 868 S.W.2d at 247.  We conclude that the trial court did not abuse its discretion, and defendant has failed to show that he was prejudiced.

The trial court permitted individual questioning of the venire.  After questioning thirty-eight jurors, the defendant asked one juror, who had already determined that the defendant was guilty based upon pretrial publicity, whether the juror thought the defendant could receive a fair trial in Hamilton County.  Seventeen jurors later, the defendant sought to ask the same question of a juror who had been excused because she had already formed an opinion regarding the defendant's guilt and could not put it aside.  This time, however, the state objected and the trial court sustained the objection.

We do not believe that the trial court erred by not allowing the defendant to question prospective jurors who had been dismissed for cause in order to support his motion for a change of venue.  Our supreme court has ruled that the "ultimate goal of voir dire is to insure that jurors are competent, unbiased, and impartial." State v. Cazes, 875 S.W.2d 253, 262 (Tenn. 1994).  The two jurors whom the defendant sought to question regarding whether he could receive a fair trial stated that they had formed an opinion regarding the defendant's guilt and could not set it aside.  These jurors were dismissed for cause by the trial court because they were clearly biased.  Further questioning of jurors, who have already been shown to be biased, in order to support a motion for a change of venue does not further the goal of voir dire, and a trial court's decision to deny such questioning is not an abuse of discretion.  Cf. State v. Marvin

18

Readus, No. 01-C-01-9006-CR-00141, Davidson County (Tenn. Crim. App. Feb. 13, 1991), applic. denied, (Tenn. July 1, 1991) (holding that Rule 24(b), Tenn. R. Crim. P., and T.C.A. § 22-3-101 do not provide a defendant with the right to question prospective jurors when the record shows the jurors are not competent). Furthermore, in light of the fact that the jurors who were impaneled stated that they either knew nothing or very little about the case and could set aside what they knew and base their decision on the facts presented at trial, we conclude that the defendant has failed to establish prejudice.

## V. DOUBLE JEOPARDY

The defendant contends that the trial court erred by not granting his motion to dismiss based on double jeopardy. He argues that because the conditions of his bond before trial constituted punishment, he could not be subsequently tried and punished for second degree murder and reckless endangerment. The state argues that the conditions of the defendant's bond did not constitute punishment.

The double jeopardy clause of the Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb . . ." Article 1, § 10 of the Tennessee Constitution provides that "no person shall, for the same offence, be twice put in jeopardy of life or limb." In State v. Pennington, 952 S.W.2d 420, 423 (Tenn. 1997), our supreme court determined that a policy of detaining for twelve hours suspected drunk drivers who refused to submit to a breathalyzer test did not constitute punishment for purposes of double jeopardy. The court noted that "the policy was intended, at least in part, to protect the public from individuals who had been arrested on suspicion of driving under the influence. This is a remedial purpose, not a punitive one . . . ." Id.

The defendant in the present case was initially released on a thirty-nine thousand-dollar bond.[1] The next day he attempted to rent a car, and the state requested that the trial court reexamine the defendant's bond. At the second bond hearing, the trial court placed the defendant under house arrest by requiring him to wear an electronic monitor, required him to live with his sister, and prohibited him from driving a vehicle. The house arrest and prohibition against driving were removed in July 1995 when the trial court determined that the defendant had satisfactorily attended court appearances.

Initially, we note that the restrictions were reasonable, particularly in light of the fact that the defendant left the scene of the accident, had four prior convictions for D.U.I., and attempted to rent a car the day after his initial bond hearing. We also believe that the conditions of the defendant's bond in the present case were remedial, not punitive, in order to ensure the defendant's appearance at court. Once the trial court was satisfied that the defendant did not present a risk of flight, the conditions were removed. Reasonable conditions for bond or pretrial detention do not implicate double jeopardy concerns.

Also, the defendant cites several civil forfeiture cases in support of his argument. We believe that those cases are factually inapposite and of no consequence in light of United States v. Ursery, 518 U.S. 267, 270, 116 S. Ct. 2135, 238 (1996).

---

[1] We note that the information regarding the conditions of the defendant's bond comes from the state's brief and the defendant's motion to dismiss because transcripts of the original and second bond hearings were not made a part of the record on appeal. It is the duty of the appellant to provide this court with transcripts necessary to convey a fair, accurate and complete account of what transpired with respect to the issues that are the bases of the appeal. T.R.A.P. 24(b). Nevertheless, we will rely on the conditions of bond as gleaned from the record we have before us and address the merits of the defendant's argument.

## VI.  TESTIMONY AND JURY INSTRUCTION REGARDING PRESUMPTIONS OF BLOOD ALCOHOL CONTENT LEVELS

The defendant argues that the trial court erred by not allowing the medical examiner or the officers from the D.U.I. Task Force to testify regarding the legal presumptions that accompany blood alcohol content levels of .05 percent and .10 percent and by failing to instruct the jury on the legal presumption of those levels.  He argues that the testimony is relevant because it shows that the victims were not thinking clearly or acting soberly at the time of the accident, and it is relevant to the defendant's state of mind in that it supports his claim that he was scared of the victims.  He contends that the evidence supported such an instruction.  The state argues that the defendant never asked the witnesses about the legal presumption of intoxication, and in any event, the testimony is irrelevant to the defendant's state of mind.  It argues that the trial court properly denied the requested instruction.

A trial court has discretion in determining the relevance of proffered evidence, and its decision will not be overturned on appeal absent an abuse of that discretion.  State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).  In addition, an accused is entitled to an instruction on every issue that is fairly raised by the evidence.  See State v. Zirkle, 910 S.W.2d 874, 892 (Tenn. Crim. App. 1995) (citations omitted).  Furthermore, a defendant has a right to have every issue of fact raised by the evidence and material to his or her defense submitted to the jury on proper instructions.  Poe v. State, 370 S.W.2d 488, 489 (Tenn. 1963).

The defendant asked Dr. King, the medical examiner, a hypothetical question regarding impairment based upon the defendant's weight and the number of drinks the defendant claimed he had before the accident.  Dr. King testified that if a person weighing one hundred and sixty to one hundred and seventy pounds had two beers in the afternoon, then four to five hours later drank two beers over a two-hour period, that person's blood alcohol content would be less than .05 percent.  Dr. King

21

testified that some individuals would be impaired at that level while others would not. He also estimated that Jezewski's blood alcohol level was probably about .11 to .12 percent at the time of the accident.

The defendant sought to elicit from Dr. King and from the officers on the D.U.I. Task Force that a person with a .10 percent blood alcohol level is presumed to be intoxicated pursuant to T.C.A. § 55-10-408(a) and that a blood alcohol content of .05 percent means that a person is not legally presumed to be intoxicated. The trial court, while allowing the defendant to ask hypothetical questions regarding blood alcohol content levels and their effects, would not allow testimony regarding the legal presumptions that accompany those levels. The trial court found that the testimony was not relevant and that the facts of the hypothetical questions were not borne out by the proof.

With respect to the state's argument that the defendant did not attempt to ask the witnesses about the legal presumption, we note that the defendant was prohibited from so doing by the trial court's ruling. Next, with respect to the defendant's contention that the trial court erred by not allowing the testimony, we conclude that the trial court did not err. The defendant argues that the legal significance of Jezewski's intoxication level is relevant to the defendant's state of mind because if Jezewski was intoxicated, he could have been acting in such a way that the defendant was justified in fearing him. However, we believe that whether Jezewski was under the influence of an intoxicant is irrelevant, particularly in light of the fact that Dr. King testified regarding the effect that a blood alcohol content level of .10 percent would have on one's actions. He testified that a blood alcohol level of .10 percent would result in decreased inhibition, altered judgment, slowed reaction time, incoordination, slurred speech, and sedation. Thus, the testimony regarding the victim's possible impairment that might arguably relate to the defendant's state of mind was admitted. There was no need for the

22

additional, speculative testimony that if Jezewski's blood alcohol content was .10 percent, he was intoxicated.

The defendant summarily argues that testimony should have been allowed regarding the legal presumption of a blood alcohol level of .05 percent. The defendant does not explain, either on appeal or during the trial, why such testimony is relevant. We conclude that it is not. The fact that the defendant may not have been under the influence does not make the existence of any fact of consequence to the determination of the action more or less probable, see Tenn. R. Evid. 401, particularly in light of the fact that Dr. King testified that a person with a blood alcohol content level of .05 percent may or may not be impaired depending on the individual.

We also conclude that the trial court did not err by not instructing the jury on the legal significance of blood alcohol content levels of .05 and .10 percent. The trial court need not instruct the jury on matters not raised by the proof. State v. Leaphart, 673 S.W.2d 870 (Tenn. Crim. App. 1983) (citations omitted). The amount of alcohol the defendant had on the day of the accident, as well as the precise blood alcohol content level of the victim at the time of the accident, is speculative. Although the defendant testified that he had two beers in the afternoon and two beers later that evening, he also said that he failed to tell the police officer of any of the drinks he had that day, except for the whiskey he said he drank at home after the accident. In addition, Dr. King's estimate of Jezewski's blood alcohol content level at the time of the accident was just that, an estimate. Furthermore, we have already concluded that whether the victims were under the influence is irrelevant in light of the fact that testimony regarding the effect of a blood alcohol level over .10 percent was admitted into evidence.

## VII. JURY CHARGE

The defendant contends that the trial court erred with respect to its charge to the jury. First, the defendant argues that the trial court erred by instructing the jury that it could find the defendant guilty of the crimes charged in all indictments. The defendant also argues that the trial court erred in its instruction on the definition of a knowing killing. The state contends that the trial court properly charged the jury.

### A.

The defendant contends that the trial court erred when it instructed the jury that he could be found guilty of all crimes charged in the indictments. He argues that although the trial court later corrected the error, the correction came too late, and the jury was probably confused. The state contends that the defendant waived any error in the charge by failing to object contemporaneously. See T.R.A.P. 36(a). It argues that in any event, the instruction was not misleading or confusing.

Initially, we note that the fact that the defendant failed to object contemporaneously to the jury charge relating to multiple indictments does not waive the issue on appeal because a defendant can raise the issue in a motion for a new trial. See Tenn. R. Crim. P. 30(b). Nevertheless, we conclude that the trial court's charge to the jury was not erroneous.

The defendant was indicted for second degree murder, vehicular homicide, and reckless endangerment. The trial court initially instructed the jury as follows:

> The crime charged in each indictment and each lesser included offense of the indictment is a separate and distinct offense. You must decide each indictment and lesser included charge separately on the evidence and the law applicable to it. A defendant may be found guilty as to one or two indictments, or he may be found not guilty as to all indictments. Your finding as to each indictment must be stated in your verdict.

24

. . . .

You must first determine if the defendant is guilty of the offense of murder in the second degree or vehicular homicide as charged in these indictments. If you agree that the defendant is guilty beyond a reasonable doubt of murder in the second degree or vehicular homicide, you may stop your discussions and return your verdict. You can find the defendant guilty of only one of these offenses.

The trial court then instructed the jury that they should only consider lesser included offenses after first determining that the defendant was not guilty of the primary offense. It also instructed the jury that the reckless endangerment charge only pertained to Steve Gentry.

We do not believe that the trial court's charge was confusing or misleading. The trial court's initial instruction merely informed the jury that the defendant could be convicted of more than one offense or acquitted of all the offenses. In light of the fact that the state's theory was that the defendant committed second degree murder of one victim and reckless endangerment of another, the instruction was correct. The defendant's contention that the instruction was confusing because the jury may have concluded that they could find the defendant guilty of both second degree murder and reckless endangerment of Jezewski is without merit. The trial court instructed the jury that the reckless endangerment charge applied only to Gentry. Thus, we conclude that the trial court's charge to the jury with respect to the multiple indictments was not erroneous.

**B.**

Next, the defendant argues that the trial court's initial definition of knowing and its subsequent answer to the jury's question regarding when the knowing must occur misled the jury. We believe that the trial court's instruction was correct.

The trial court instructed the jury as follows:

25

> A person acts "knowingly" or "with knowledge" if that person acts with an awareness either,
>
> (1) that his or her conduct is of a particular nature, or
>
> (2) that a particular circumstance exists.
>
> A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

After several hours of deliberation, the jury asked the trial court, "As a matter of law, does knowing take place before, during, or after an act?" In response, the trial court instructed the jury as follows:

> Every criminal offense requires a culpable mental state. A culpable mental state is either intentionally, knowingly, or recklessly. When the offense is committed, the person must be acting intentionally, knowingly, or recklessly. Read again the elements of the offenses to find the culpable mental state.

First, we conclude that the trial court's initial instruction on the definition of knowing was appropriate. The definition is a variation of the definition of knowing in T.C.A. § 39-11-302(b) and was not confusing or misleading. Cf. State v. Raines, 882 S.W.2d 376, 383 (Tenn. Crim. App. 1994) (holding that the term "knowing" is commonly used and can be understood by persons of ordinary intelligence).

The defendant also argues that the trial court's response to the jury's question was misleading because the jurors could have concluded that they only had to find that the defendant acted recklessly in order to convict him of second degree murder. We do not believe that the trial court's instruction supports such an assertion. The trial court informed the jurors of the three culpable mental states, instructing the jury to review the elements of the offenses to determine which mental state applied to the offense they were considering. The jury's question to the trial court did not specify which offense it was considering in asking its question, and the trial court's answer merely ensured that the jurors were looking at the appropriate culpable mental state for the offense.

26

Finally, the defendant argues that the trial court's answer did not adequately address the jury's concern about when one must possess the culpable mental state. He contends that the trial court's answer led the jury to believe that the knowing mental state can occur after the act. However, the plain language of the trial court's answer belies the defendant's claim. The trial court instructed the jury that the culpable mental state must take place when the offense is committed. This issue is without merit.

## VIII. CONSTITUTIONALITY OF T.C.A. § 40-35-201(b)

The defendant argues that T.C.A. § 40-35-201(b)[2] violates the equal protection and due process clauses of the United States and Tennessee Constitutions because it allows a jury to convict a defendant based not on the evidence but on the punishment the jury feels is most appropriate. He also argues that the statute is unconstitutional because sentencing matters are irrelevant to the jury's determination of guilt or innocence. The state argues that the statute is constitutional.

T.C.A. § 40-35-201(b) provides that "upon the motion of either party, filed with the court prior to the selection of the jury, the court shall charge the possible penalties for the offense charged and all lesser included offenses." When such a charge is requested by either party, section (b)(2)(A)(i) provides:

> When a charge as to possible penalties has been requested pursuant to subdivision (b)(1), the judge shall also include in the instructions for the jury to weigh and consider the meaning of a sentence of imprisonment for the offense charged and any lesser included offenses. Such instruction shall include an approximate calculation of the minimum number of years a person sentenced to imprisonment for the offense charged and lesser included offenses must serve before reaching such person's earliest release eligibility date. Such calculation shall include such factors as the release eligibility percentage

---

[2] We note that effective May 18, 1998, the Tennessee General Assembly amended T.C.A. § 40-35-201, deleting subsection (b) and replacing it with a new provision that provides that juries in non-capital cases shall not be instructed on the possible penalties for the offense charged or lesser included offenses. This amendment does not apply to cases tried before the effective date of the amendment. 1998 Tenn. Public Acts CEDRIC HARTS:. 1041, § 2.

27

established by § 40-35-501, maximum and minimum sentence reduction credits authorized by § 41-21-236 and the governor's power to reduce prison overcrowding pursuant to title 41, chapter 1, part 5, if applicable.

Our supreme court recently addressed the same claims the defendant makes in the present case with respect to T.C.A. § 40-35-201(b) in State v. King, 973 S.W.2d 586, 587 (Tenn. 1998). In King, the defendant argued that T.C.A. § 40-35-201(b) was unconstitutional because it violated his due process rights under both the United States and Tennessee Constitutions. The defendant in King, like the defendant in the present case, relied on Farris v. State, 535 S.W.2d 608, 612-13 (Tenn. 1976) to support his argument that the statute was unconstitutionally vague and impossible to apply. Our supreme court distinguished the statute at issue in Farris, holding that T.C.A. § 40-35-201(b), in contrast, "does not leave a jury to speculate about release eligibility dates, good time credits and safety valve release provisions." King, 973 S.W.2d at 589. The court concluded that the statute provides explicit and unambiguous guidance such that the defendant's claim of vagueness was without merit. Id. at 950. The same reasoning applies to the present case, and we conclude that the statute is not unconstitutionally vague.

In King, the defendant also claimed that T.C.A. § 40-35-201(b) was unconstitutional because sentencing considerations are irrelevant to the jury's determination of guilt or innocence. The court held that deference should be given to the legislature's determination that the sentencing information is relevant, noting that the jurors were properly instructed that the state had the burden of proof and that they were not to fix punishment. Id. at 591.

The defendant in the present case makes the same argument as the defendant in King with respect to relevance. In the present case, as in King, the trial court instructed the jury that it was not to attempt to fix any sentence but that it was to

28

weigh and consider the meaning of a sentence of imprisonment.  It also instructed the

jury that the state had the burden of proof.  We believe that our supreme court's

analysis in <u>King</u> applies to the present case, and we conclude that the statute is not

unconstitutional as applied in the present case.


## IX.  INSTRUCTION REGARDING DEFENDANT'S
## EARLIEST RELEASE ELIGIBILITY

The defendant contends that the trial court erred by instructing the jury

regarding his earliest release eligibility date for second degree murder because the trial

court incorrectly calculated his earliest release eligibility date.  Also, he contends that

the trial court should have instructed the jury on the earliest release eligibility date for a

twenty-five-year sentence, which is the maximum sentence in the range and is the

sentence he received.  He contends that the errors were prejudicial and require a new

trial.  The state first contends that the defendant waived any argument with respect to

the trial court's instruction for failing to object timely.  The state argues that if the issue

is not waived, any error in the instruction was harmless because the trial court, not the

jury, sentenced the defendant.


Initially, we note that the defendant's failure to object contemporaneously

to the trial court's instruction does not waive our review of the issue on appeal.  <u>See</u>

Tenn. R. Crim. P. 30(b).  After careful review, we conclude that any error in the trial

court's instruction was harmless because it is unlikely that the error more probably than

not affected the judgment or would result in prejudice to the judicial process.  T.R.A.P.

36(b).


## A.

First, the defendant argues that the trial court erred in its instruction to the

jury regarding the defendant's earliest eligibility for release.  The trial court instructed

the jurors, pursuant to T.C.A. § 40-35-201(b), that the range of punishment for second degree murder is fifteen to twenty-five years. The trial court then instructed the jurors that the earliest time at which the defendant could be released would be after serving 1.77 years. The defendant claims that the earliest he could possibly be released, based upon a fifteen-year sentence, would be after serving 2.95 years. At the hearing for the motion for a new trial, the trial court acknowledged its error but concluded that the error was harmless. We agree.

The defendant argues that our supreme court's decision in State v. Cook, 816 S.W.2d 322, 327 (Tenn. 1991), is controlling. In that case, the defendant was charged with aggravated rape and aggravated sexual battery. The trial court erroneously instructed the jury on the range of punishment for a Range I offender, even though the aggravated nature of the offenses necessitated that the defendant be sentenced as a Range II offender. Thus, the minimum sentence in the range of punishment provided to the jury for the aggravated rape charge was twenty years lower than the minimum sentence in the range that was actually imposed. Id. at 323.

Our supreme court determined that T.C.A. § 40-35-201(b) (1989) provides a defendant with a statutory right to have the jury informed of the applicable range of punishment. Id. at 326. The court reversed the defendant's convictions and remanded the case for a new trial, noting that "whatever rights or benefits the Legislature had in mind for the defendant when it passed T.C.A. § 40-35-201(b) would be lost if the defendant were to be sentenced to punishments greater than what the jury finding guilt was instructed would be imposed." Id. at 327.

We believe that the defendant's reliance on Cook is misplaced. Unlike in Cook, the trial court in the present case did not err in its instruction on the range of punishment but rather on the earliest release eligibility date. In addition, the

30

discrepancy between the trial court's instruction and the defendant's actual earliest release eligibility date is only a little over a year, whereas the discrepancy in Cook was twenty years. We also note that the statute requires the trial court to give an approximate calculation of the defendant's earliest release eligibility date, not an exact calculation. T.C.A. § 40-35-201(b)(2)(A)(i). Although the trial court's calculation was wrong, we do not believe that the error prejudiced the defendant, as it did in Cook, such that a new trial is warranted. See State v. J.C. Meyer, No. 03C01-9705-CR-00165, McMinn County (Tenn. Crim. App. June 26, 1998), applic. filed, (Tenn. July 8, 1998) (holding that trial court's erroneous instruction on the defendant's earliest release eligibility date was harmless when trial court instructed the jury on the elements of the offense charged and the evidence was substantial).

**B.**

The defendant also contends that the trial court erred by not instructing the jury that if he received the maximum sentence of twenty-five years, his earliest release eligibility would be after serving five years. He contends that because the state filed a notice to seek enhanced punishment before the trial court gave its instruction, the trial court was aware that there was a good chance that he would receive a longer sentence than the statutory minimum. We conclude that the trial court's instruction was accurate.

The statute provides a defendant with the right to "an approximate calculation of the minimum number of years a person sentenced to imprisonment for the offense charged and lesser included offenses must serve before reaching such person's earliest release eligibility date." T.C.A. § 400-35-201(b)(2)(A)(i). The offense of second degree murder carries with it a minimum sentence of fifteen years for a Range I offender and an earliest release eligibility date of 2.95 years. Although the trial court committed harmless error when it instructed the jury that the earliest release

31

eligibility date was 1.77 years, the trial court otherwise complied with the statute. There is no requirement in the statute that the trial court instruct the jury as to all possible early release eligibility dates. The fact that the defendant might possibly receive an enhanced sentence within the range does not affect the requirements of the statute. See King, 973 S.W.2d at 590-91 (holding that the trial court's instruction on the defendant's earliest release eligibility date was accurate even though the state filed a notice of enhancement because "the actual decision whether to permit enhancement does not occur until after conviction . . .").

## X.  ADMISSION OF EVIDENCE AT SENTENCING

The defendant argues that the trial court erroneously admitted certain evidence at the sentencing hearing. Specifically, the defendant argues that the trial court should not have admitted evidence that he threatened to run over a coworker in 1977 and should not have admitted a defensive driving certificate found in the defendant's car after the accident. The state argues that the evidence was properly admitted.

### A.

The defendant first contends that the trial court should not have admitted into evidence a statement from his employer contained in the defendant's personnel file reflecting that in 1977, the defendant threatened to run over a security guard at work who would not let him park in a certain area. The defendant asserts that he was not informed of the statement until one day before the sentencing hearing, the statement is hearsay, and the statement is irrelevant. The state contends that the statement was part of the defendant's employment record which, as part of the state's file, was available to the defendant long before the sentencing hearing. The state also contends that the statement is not hearsay because it is part of a business record, and it is relevant because it provides details about the incident.

32

Initially, we note that a trial court has discretion in determining the relevance of proffered evidence, and its decision will not be overturned on appeal absent an abuse of that discretion. DuBose, 953 S.W.2d at 652. We also note that the defendant's contention that he did not have knowledge of the incident is without merit in light of the fact that the incident was acknowledged and explained in the employment information section of the presentence report. As the trial court noted, the statement admitted at the sentencing hearing merely provided more detail.

We agree with the defendant's contention that the employment statement is hearsay, however we believe that the statement is admissible under the business records exception to the hearsay rule of exclusion. Tenn. R. Evid. 803(6). Furthermore, T.C.A. § 40-35-209(b) provides for the admission of reliable hearsay at a sentencing hearing if the opposing party is accorded a fair opportunity to rebut such evidence. The defendant had a fair opportunity to rebut the evidence, and we note that the defendant did so by having his sister testify at the sentencing hearing that the defendant was quiet and "never said anything about anybody."

The defendant also argues that the statement is irrelevant. However, the defendant requested that the trial court consider, as a mitigating factor, the defendant's long and steady work record. Although the statement is not relevant to show a propensity to engage in or threaten to engage in dangerous conduct, we believe that the fact that the defendant was discharged and subsequently reinstated for threatening a security guard bears on the trial court's consideration of the defendant's work record as a mitigating factor.

**B.**

The defendant also argues that the trial court erred by admitting into evidence an agreement found in the glove compartment of his car in which the

33

defendant agreed to attend defensive driving school. He contends that the agreement is irrelevant because it alludes to a previous conviction that was already in the record. The state argues that the agreement is relevant to sentencing because it shows that at the time of the offense, the defendant was under an obligation to attend a national defensive driving course because of prior offenses, and it is probative of his criminal conduct and inability to comply with the law.

We question the agreement's relevance regarding its tendency to make the existence of any fact of consequence more or less probable. Tenn. R. Evid. 401. In any event, the fact of the defendant's inability to comply with the law and his criminal conduct was already known to the trial court by the admission of his prior convictions in the presentence report. We believe that the admission of the agreement was harmless.

## XI. SENTENCING

The defendant contends that the trial court erroneously applied certain aggravating factors, failed to consider applicable mitigating factors, and imposed an excessive sentence. The state argues that the defendant was properly sentenced.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1995).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103 and -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986).

Under the Criminal Sentencing Reform Act in effect at the time of the offense, the sentence to be imposed by the trial court for a Class A felony is presumptively the minimum in the range when there are no enhancement or mitigating factors present. T.C.A. § 40-35-210(c) (1989). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. T.C.A. § 40-35-210(d) and (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. T.C.A. § 40-

35-210, Sentencing Commission Comments; <u>Moss</u>, 727 S.W.2d at 237; <u>see</u> <u>Ashby</u>, 823 S.W.2d at 169.

At the sentencing hearing, Reverend Gayland Wiley testified that the defendant had been a regular member of his church since 1991. He testified that the defendant made regular financial contributions to the church.

Carolyn Hogan, the defendant's sister, testified that the deaths of two of their brothers thirty years ago affected the defendant. She said the defendant has a daughter and a granddaughter whom he had supported. She said the defendant had been depressed since the incident, and he told her he thought he was protecting himself on the night of the incident. She said the defendant was attending Alcoholics Anonymous meetings. She also said the defendant has an eighty-two-year-old mother. She said the defendant was quiet and never said anything to anybody. She introduced a letter, signed by the defendant's friends and family, asking the court for leniency.

Dr. John Hendrick, a psychiatrist, testified that he treated the defendant on September 2, 1994, at Valley Hospital. He said the defendant suffered from major depression, suicidal thoughts, and alcohol dependence. He said that he was continuing to treat the defendant. He said the defendant expressed remorse and guilt over the incident. He testified that the defendant told him he generally cannot hear. He said the defendant's speech was fluent and coherent, but the defendant stuttered, had difficulty completing words, and had difficulty hearing, particularly in the left ear. He said he often had to repeat things to the defendant. He said the defendant's hearing problems contributed to his depression and caused paranoia.

A presentence report was introduced into evidence. The report reflects that the then forty-eight-year-old defendant completed high school and attended

welding and maintenance trade school. It reflects that the defendant worked for W.R. Grace since 1973, although he was discharged then reinstated in 1977 for using abusive language to a security guard at the company. The report shows that the defendant has ten convictions from 1971 to 1989, four for drug offenses, two for driving on a revoked license, and four for driving under the influence of an intoxicant (D.U.I.).

With respect to the second degree murder conviction, the trial court applied the following enhancement factors, as listed in T.C.A. § 40-35-114:

> (1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; and
>
> (9) The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense;

With respect to the reckless endangerment conviction, the trial court also applied factor (1), along with the following additional factors:

> (10) The defendant had no hesitation about committing a crime when the risk to human life was high; and
>
> (16) The crime was committed under circumstances under which the potential for bodily injury to a victim was great.

The trial court found no applicable mitigating factors.

At the conclusion of the sentencing hearing, the trial court sentenced the defendant as a Range I, standard offender to twenty-five years confinement for the second degree murder conviction, and two years confinement for the reckless endangerment conviction, to be served concurrently. The trial court gave the defendant credit for the time he spent in house arrest as part of his bond before trial.

The defendant argues that the trial court erroneously applied all enhancement factors. The defendant does not cite any case law in support of his argument. Generally, the failure to cite any authority acts as a waiver of the issue.

Tenn. Crim. App. R. 10(b). Nevertheless, in conducting our de novo review we must address the propriety of the defendant's sentence, which includes an analysis of the applicable enhancement and mitigating factors.

First, we conclude that enhancement factor (1) is applicable to both the second degree murder and reckless endangerment convictions. The defendant's extensive prior criminal history is apparent from the record. Although the defendant argues that the convictions are old and are for nonviolent offenses, the convictions may still be used to enhance.

Next, we conclude that the trial court correctly applied factor (9) to the second degree murder conviction and factors (10) and (16) to the reckless endangerment conviction. Factor (9) applies because the car was used as a deadly weapon against Jezewski. See State v. Norris, 874 S.W.2d 590, 601 (Tenn. Crim. App. 1993). Although we believe that factor (16) is an essential element of the offense of reckless endangerment, factors (10) and (16) nevertheless apply because when the defendant accelerated, causing the door to disengage and strike Gentry, there was also a high risk and a great potential for bodily injury to Jezewski, who was standing in the doorway. See State v. Ruane, 912 S.W.2d 766, 784 (Tenn. Crim. App. 1995) (holding that factor (10) may be applied when someone besides the victim is present and at risk); State v. Sims, 909 S.W.2d 50, 51 (Tenn. Crim. App. 1995) (holding that both factors (10) and (16) may be applied when someone other than the victim is in the area and subject to injury).

We also note that the record reflects that the defendant had previously driven on a revoked license while he was on probation for D.U.I. This can be considered as some history of an unwillingness to comply with conditions of sentence involving release in the community. See T.C.A. § 40-35-114(8). In context, though, it is

38

of little or no consequence above the culpability shown by the repetitive offenses relative to intoxicants and driving.

The defendant argues that the trial court should have applied the following mitigating factors, as listed in T.C.A. § 40-35-113:

> (2) the defendant acted under strong provocation;
>
> (3) substantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense;
>
> (8) the defendant was suffering from a mental or physical condition that significantly reduced the defendant's culpability for the offense . . .;
>
> (11) the defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct; and
>
> (13) any other factor consistent with the purposes of this chapter.

With respect to factor (13), the defendant argues that the trial court should have considered the fact that he had a steady work record, supported his daughter, expressed remorse, and regularly attended and supported his church.

We conclude that although mitigating factors (2), (3), and (8) are not applicable, factors (11) and (13) are. With respect to factors (2) and (3), we believe that the record does not support their application. Although the defendant contends that the victims were drunk, that he thought they were going to carjack him, and that they demanded that he get out of his car, Gentry testified that the defendant understood what they were saying because he responded logically to their questions. He also testified that the conversation between Jezewski and the defendant remained pleasant. The defendant testified that neither Gentry nor Jezewski had any weapons. Thus, we conclude that factors (2) and (3) are not applicable.

The defendant argues that factor (8) should apply because he could not hear what the victims were saying. He argues that if he had been able to understand them, he would have realized that they were trying to help him and the accident would have been avoided. Although the proof established that the defendant had hearing loss, we do not believe that this significantly reduced the defendant's culpability for the offense. Again, the proof established that the defendant was able to respond logically to the victim's questions, thus showing that the defendant could understand what they were saying.

The defendant also argues that factor (8) should apply because he stuttered. He contends that if not for his stuttering, Gentry and Jezewski might not have tried to keep the defendant from driving and the accident might not have occurred. However, the proof showed that Jezewski spotted the defendant in the parking lot and determined, without ever talking to him, that he should not drive. The defendant argues that his stuttering, combined with the hearing problem, shows that the defendant and the victims could not communicate. However, the record belies this argument because it shows that the defendant could respond logically to the victim's questions.

Finally, the defendant states in his brief that he suffered from major depression and alcohol dependence. He does not explain how this relates to the application of factor (8), and we conclude that it does not.

We believe that the trial court erred by not applying mitigating factors (11) and (13). Initially, we note that there is no evidence in the record that the trial court considered mitigating factor (13), although the defendant raised it at the sentencing hearing. It is incumbent upon the trial court to state on the record its evaluation of enhancement and mitigating factors. T.C.A. § 40-35-210(f) (1990). Failure to do so in material fashion strips its determinations of the presumption of correctness.

40

With respect to factor (11), we believe that the bizarre circumstances of the offense, as depicted in the testimony of most of the eyewitnesses, show that a sustained intent to violate the law did not motivate the defendant's conduct, and we believe this factor warrants significant weight. With respect to factor (13), we conclude that the defendant's steady work record, support of his daughter, expression of remorse, and regular attendance and support of his church should be considered in mitigation in the present case, although we believe they are of very little weight. See State v. Leggs, 955 S.W.2d 845, 850 (Tenn. Crim. App. 1997) (concluding that remorse is an appropriate mitigating factor under (13)); State v. McKnight, 900 S.W.2d 36, 55 (Tenn. Crim. App. 1994) (indicating that family contributions and work ethic might be a mitigating factor). But see, State v. Keel, 882 S.W.2d 410, 423 (Tenn. Crim. App. 1994) (concluding that a stable work history is expected of every citizen and should not be applied in mitigation).

Now we must determine whether the application and weighing of mitigating factors alters the defendant's sentence. We conclude that it does. With respect to the second degree murder conviction, we believe that great weight should be given to enhancement factors (1) and (9). The defendant's previous criminal history, including four convictions for drinking while operating a potentially deadly weapon, show the defendant's repeated disregard for the law and for the safety of others. In mitigation, we believe that the defendant's lack of a sustained intent to violate the law warrants significant weight, but his work history and his contributions to his family and his church should be given only marginal weight. We are mindful that while a sentence should reflect the seriousness of the circumstances surrounding the offense, it also "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed . . . ." T.C.A. § 40-35-103(5). After applying and weighing the enhancement and mitigating factors, we conclude that a sentence of twenty-three years

confinement for the second degree murder conviction is appropriate and is not excessive.

With respect to the reckless endangerment conviction, great weight may be given to enhancement factor (1) and moderate weight to factors (10) and (16). Again, we give significant weight to mitigating factor (11), very little weight to factor (13), and we conclude that the two-year sentence imposed by the trial court was appropriate.

## XII. CONCLUSION

In consideration of the foregoing and the record as a whole, we affirm the convictions and the sentence for reckless endangerment. We modify the sentence for second degree murder to twenty-three years confinement.

_____
Joseph M. Tipton, Judge

CONCUR:


_____
Jerry L. Smith, Judge


_____
Thomas T. Woodall, Judge


**IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE**

**AT KNOXVILLE**

**FEBRUARY 1997 SESSION**

FILED

February 4, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| STATE OF TENNESSEE, | ) | C.C.A. NO. 03C01-9608-CR-00302 |
| | ) | |
| Appellee, | ) | |
| | ) | HAMILTON COUNTY |
| V. | ) | |
| | ) | |
| | ) | HON. STEPHEN M. BEVIL, |
| JUDGE | | |
| CHARLES FRANK BANKSTON, | ) | |
| | ) | (Second degree murder and |
| reckless | | |
| Appellant. | ) | endangerment with a deadly |
| weapon) | | |

## SEPARATE OPINION CONCURRING
## IN PART AND DISSENTING IN PART

I agree with all parts of the majority's opinion in this case except that portion wherein the sentence for second degree murder is reduced to twenty-three (23) years. While I agree that the mitigating factors under Tennessee Code Annotated section 40-35-113(13) are applicable but should be entitled to little weight, I respectfully disagree that the mitigating factor in Tennessee Code Annotated section 40-35-113(11) is applicable.

Specifically, that mitigating factor states as follows:

(11) The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct;

It is my opinion that Tennessee Code Annotated section 40-35-113(11) refers to a defendant's intent which motivates his or her conduct involved

in the particular offense(s) for which he or she is being sentenced. See State v. Larry Trent, C.C.A. No. 137, Hawkins County (Tenn. Crim. App., Knoxville, June 7, 1991). In the present case, Randy Murray specifically testified that Defendant "floored" the accelerator while it was in reverse, throwing Dr. Jezewski into the middle of the parking lot. More important for sentencing purposes, Mr. Murray further testified that the Defendant then operated his vehicle in a forward motion at a "regular pace" until he came right up in front of Dr. Jezewski. Then, according to Murray, the Defendant accelerated as fast as he could when he ran over the victim. To me, this proof demonstrates a sustained intent to violate the law on the part of Defendant.

Another factor which justifies the sentence imposed by the trial court is the fact that enhancement factor number (8) is applicable, even though it was not relied upon by the trial court. That factor states that "[t]he defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community." Tenn. Code Ann. § 40-35-114(8). The Defendant has a rather lengthy criminal record. It reflects in part that he was convicted of DUI on November 15, 1985, and received a sentence of eleven (11) months and twenty-nine (29) days, suspended after ten (10) days. During the period of the suspended sentence, on March 5, 1986, Defendant was arrested for the offense of driving on a revoked license for which he was convicted on July 22, 1986. A normal condition of a sentence involving release in the community is to obey the laws of the State. Clearly, Defendant did not comply with that condition during the service of his suspended sentence for the November, 1985 conviction of DUI. While this may not be entitled to as much weight as other factors imposed by the trial court,

it does help to justify the sentence imposed, especially in light of the fact that mitigating factor number (11) should not apply.

For the reasons stated herein, I would affirm the conviction and sentence imposed by the trial court.

_____
THOMAS T. WOODALL, Judge